Michael W. POLING, Appellant
(Defendant below)

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 1084S377.

Supreme Court of Indiana.

Dec. 2, 1987.

Mary M. Runnells, Lloyd D. Richards, Bloomfield, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Michael W. Poling was found guilty by a jury in the Daviess Circuit Court of murder while in the perpetration of rape, and was subsequently sentenced by the trial judge to a term of sixty (60) years.

Seven issues are raised for our consideration in this direct appeal:

1. error in allowing Poling's oral and written statements into evidence;
2. error in permitting accomplice Christopher Deckard to testify;
3. permitting four prosecutors to sit at the State's table during trial;
4. alleged improper sequestration of the jury;
5. refusal to grant a mistrial due to actions of the Posey County Sheriff's deputies;
6. final instructions; and
7. sentencing.

The facts show that at about 7:00 p.m. on July 2, 1983, fifteen-year-old Cindy Lou Mason went to the carnival in Linton, Indiana. She was supposed to meet a friend there and return home by 11:00 p.m. When she was not home by 11:30, family members began looking for her without success. Her body was found the next evening at a partially built abandoned home in the country in Greene County, known locally as the stone house. Mason had been shot in the head three times, once about five minutes after she died. She had superficial wounds or cuts on her shoulders, which had been made while she was alive and standing. Her face and neck also showed cuts but those had been made after she died. Her pants, which had been cut and torn, were around her ankles. Her bra, which also was cut or torn, and her blouse, which was inside out, were near her head.

On that same evening, Appellant Poling and Christopher Deckard also went to the carnival at Linton. Both boys were seventeen years of age. Before he left home, Deckard put his step-father's .357 magnum Smith & Wesson handgun in the glovebox of the car. He also took along a bottle of whiskey, which the boys drank on their way to the carnival. When they arrived at the carnival they met Cindy Mason, the victim. The three of them later left the carnival and went to the abandoned country home where Mason was found the next

day. Poling told the San Francisco, California police that Deckard and Mason first went into the house and came back after ten or fifteen minutes. He stated he and Mason then went into the house while Deckard remained in the car. He stated they were petting in the house and he requested Mason have intercourse with him but she refused and called him a "bastard." He said he had taken the pistol from the glove compartment of the car and he became so enraged at Mason's attitude that he pulled out the gun and shot her in the head "four or five times." He then came out and he and Deckard left the scene immediately.

At trial, Poling stated he did not go into the house with Mason. Rather, he stated Deckard had gone in. Poling said he heard shots and noise, and then Deckard came back and said they had to leave immediately. During Poling's trial, Deckard testified he went into the house with Mason for a short time and then came out. Deckard stated Poling then went into the house with Mason. Deckard heard shots and Poling came out, telling him they must leave immediately. The boys then went to Deckard's house and obtained Deckard's mother's automobile, about $286.00 in cash, and clean clothes, then headed for California. In Missouri they replaced the Indiana license plate on the car with a Missouri license plate. They put the Indiana plate underneath the front seat of the automobile. After spending about three weeks in California, they were arrested in a San Francisco parking lot.

## I

■ Poling first asserts his original arrest was without probable cause and subsequent statements he made were therefore inadmissible as fruit of a poisonous tree. A police officer may make an initial or investigatory stop of a person or automobile under circumstances where probable cause for arrest is lacking when the facts known to the officer at the time of the stop are such as to warrant a man of reasonable caution to believe an investigation is appropriate. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889;

*Taylor v. State* (1980), 273 Ind. 558, 561, 406 N.E.2d 247, 250. Even in a routine stop, based on safety concerns, an officer may, consistent with the Fourth Amendment, exercise discretion to require a driver who commits a traffic violation to exit the vehicle even though the officer lacks any particularized reason for believing the driver possesses a weapon. *New York v. Class* (1986), 475 U.S. 106, 106 S.Ct. 960, 89 L.Ed. 2d 81, *citing Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed. 2d 331.

■ Consistent with *Terry* and its progeny, it was reasonable for the police to make a routine investigation of the circumstances under which they observed Poling and Deckard in this area. San Francisco Police Sergeant Michael W. McNeil was on patrol with Recruit Officer Charles Lyons in the area of Polk and Bush Streets. They testified this was an extremely high crime area in San Francisco, known for homosexual prostitutes, a great deal of trafficking, and drug abuse, particularly use of cocaine. They saw the two boys in a car in the parking lot. They noticed the automobile had a Missouri license plate and also observed that because of the ages of the boys they could be runaways. The officers could not tell if the boys were asleep or unconscious from drug use, and decided to investigate. They approached the vehicle and asked the boys to get out. When asked his identity, Poling first gave his true name and then changed it. Deckard said there was a knife under the front seat on the passenger side and began to reach for it. McNeil ordered Deckard out of the car and then, for his own protection, McNeil reached under the seat to retrieve the knife himself. He first found the car's original Indiana license plate and a holster for a handgun. He also found the knife. The police had probable cause to believe the vehicle was stolen and the boys had used it to run away from home. This was sufficient probable cause to take the boys into custody and the trial court properly denied the motion to suppress.

Poling next claims the statements were inadmissible because he was denied access to an attorney and he did not have an opportunity to have a meaningful consultation with his mother before making the statements, citing *Lewis v. State* (1972), 259 Ind. 431, 288 N.E.2d 138, 142, and *Chandler v. State* (1981), 275 Ind. 624, 419 N.E.2d 142. The requirements for juvenile admissions are codified in Ind.Code § 31–6–7–3. These requirements are adjuncts to the requirements of the *Miranda* case which sets forth procedural safeguards which must be met prior to custodial interrogations by police.

 Poling's statements were not the result of custodial interrogation, but were volunteered. There is no conflict in the fact that Poling volunteered the oral statements with no prompting from the police officers. *Miranda* and *Lewis* are not therefore applicable. Poling had, nevertheless, been given his constitutional advisements pursuant to *Miranda,* had acknowledged he understood them, and had signed a waiver form declining to assert any of the rights thereunder. Sergeant McNiel said he advised Poling that he ought to talk to his parents and asked Poling if he wanted to call them. Poling said he did not. McNiel then offered to call Poling's parents for him but got no response from Poling. Poling testified at trial that he was not given an opportunity to call his parents until after the statements were made but this was in direct conflict with the testimony of the officers. Furthermore, there is no evidence nor is it claimed Poling called his mother even at this time. Officer Antonio T. Parra was in the room with Poling and heard Poling begin talking softly while looking at the floor. Poling apologized for shooting the victim and said he could remember seeing the blood on her head. He said he shot her because she refused "to make love with him and called him a bastard." None of these statements was in response to any conversation between Poling and Parra. Poling then looked up at Parra and said what he had done was wrong and he was ready for his punishment.

Parra again read Poling his *Miranda* rights and asked him if he wished to make a written statement. Poling asked if Deckard had given a statement. Parra answered Deckard had done so, and without any further prompting or interrogation, Poling said he would like to make a statement. Parra gave Poling a form containing an advisement of rights and room to write out his statement. Parra explained to Poling how to fill out the form, asked him to read the advisement of rights, and asked that the statement be in chronological order. Parra asked no questions nor in any way interrogated Poling. Poling wrote a short statement relating that he and Deckard had picked up Cindy Mason at the carnival. Mason was known to Deckard but not to Poling. They went to the old stone house and Deckard and Mason first went in "to find a good place" while Poling stayed in the car. While looking in the glove box for some matches, Poling found a gun and put it in the pocket of his trousers. Mason and Deckard soon came back and Poling and Mason then went into the house. They were petting very heavily and Poling requested she go further with him. She refused, telling him she was not a "slut" and finally calling him a bastard. Poling said this so enraged him that he pulled out the gun and shot her five or six times. Officer Parra read Poling's statement and then said, "You should tell what happened to the gun." Poling then wrote, on a separate page, a single statement that he lost the gun somewhere while he was walking with Deckard but didn't remember where.

 Finally, Poling claims he was coerced into making the statements by the coercive atmosphere he faced in the police station. The San Francisco officers admitted he was not given food or drink and he was handcuffed to a bench in the waiting room a great deal of the time, while they attempted to determine his status in Indiana. He was released to go to the bathroom when he needed to do so. This period was in the afternoon from about 4:00 p.m. until 9:00 p.m. There is no evidence he was refused food or drink or desired any, merely the statement that he did not receive any. There is no evidence

nor does Poling claim he was threatened or mistreated by the police or that they pressured him in any way to give a statement. Under all these circumstances we find the trial court did not err in overruling the motion to suppress the statements.

■ Poling further claims insufficient evidence was produced to support the jury's verdict of guilty of murder. His argument was based primarily on his claim that his confessions should not have been admitted into evidence. In addition to his own statements, Deckard testified and related the events as Poling had given them in his statements. The victim's body was found with her clothes ripped and torn. She was in a position suggesting sexual intercourse had taken place and substances were found in her vagina that could have been semen. It was not possible to determine conclusively that it was, in fact, semen. The weight and credibility of the evidence, however, was subject to determination by the jury and there was sufficient evidence before them to make the determination they did.

## II

■ Poling next claims it was error for the trial court to allow Deckard to testify and to allow Deckard's attorney to inject himself into the proceedings. Deckard had been tried previously and acquitted. He apparently gave the same testimony at Poling's trial that he had in his own, that Poling had gone into the house and killed the victim while Deckard remained in the automobile. Deckard claimed he had nothing to do with the actual incident. During closing argument at Deckard's trial, the prosecuting attorney claimed that Deckard was not telling the truth and attempted to convince that jury that Deckard was involved in the murder. Poling now claims the State violated E.C. 7–26 of the Code of Professional Responsibility by putting Deckard on the stand and using fraudulent, false, or perjured testimony. In Poling's trial, the State did refer the jury to the fact they might find Deckard's credibility questionable but took the position it was necessary for them to call him as an occurrence

witness since he was the only other living person present. We cannot say it was improper for the State to call Deckard nor for the trial judge to permit his testimony. The fact they had some suspicions of his involvement and credibility would not give rise to the conclusion they were purposely and knowingly fostering perjured testimony.

■ Poling further complains it was improper for Deckard's attorney, Larry Wagner, to interfere with the cross-examination of Deckard. During cross-examination Deckard was asked the whereabouts of his current residence. Attorney Wagner objected, then approached the bench, followed by the other attorneys of record, and had a private conversation with the court. Nothing further was done by Wagner and the question of Deckard's residence was not pursued. Poling now claims he was prejudiced by the interference of Deckard's attorney but gives us no reason to find such prejudice, and we see none. Furthermore, Poling made no objection during trial about the Wagner's presence or about his objection in open court. This issue is therefore waived. *Suggs v. State* (1981), Ind., 428 N.E.2d 226, 229, *reh. denied.*

## III

■ Poling claims it was error for the court to overrule his objection to the presence of four attorneys at the State's table. The crimes here occurred entirely within Greene County and the charges were brought in that county. Due to the pretrial publicity and strong local opinion, Poling requested a change of venue. The cause was then venued to Daviess County. Because Daviess bordered Greene County, Poling requested the jury be selected from a county more distant from Greene. This request was granted and by agreement of all parties, the jury was picked in Posey County and brought to Daviess County to try the case. Poling does not object to the presence of the prosecuting attorney of Greene County and his deputy nor to the prosecuting attorney of Daviess County. Poling objects to the fact that the Posey County prosecutor was at the State's coun-

sel table and took some part in the trial. Poling cites no authority nor points to any particular events which would indicate prejudice to him other than the alleged oppressiveness of sheer numbers. This was a matter of judicial discretion and we see no abuse that suggests or requires reversal.

## IV

 Poling next contends the court acted improperly regarding issues of sequestration of the jury. The jury was picked in Posey County, which is three counties removed from Daviess County, the site of the trial. At the end of the first day of *voir dire,* eleven jurors had been selected. Of these eleven, nine were no longer subject to peremptory challenge pursuant to agreed on local rules but were still subject to challenge for cause. The next day, the remaining juror and two alternates were chosen. Poling moved to sequester the prospective jurors after the first day of *voir dire,* but the trial court refused. Before leaving the courtroom at the end of the first day, the trial judge admonished the jurors in detail that they not discuss the case with anyone nor be in contact with anyone who might influence their decision. The next morning, the trial judge questioned each prospective juror separately and each of them denied any contact with any person, including any media personnel. It is reversible error for a trial court to refuse to sequester a jury during a capital trial when requested to do so by the defendant. *Thompson v. State* (1986), Ind., 492 N.E.2d 264, 268, *reh. denied.* Here, however, the death penalty was requested but was not imposed on Poling. Also, the jury was sequestered after they were sworn. There is therefore no reversible error on this issue.

 Poling further claims the trial court erred in failing to hold a hearing when allegations arose concerning improper sequestration of the jury during the trial. These questions were raised in Poling's motion to correct error. Attached to the motion to correct error were affidavits, one alleging the jury could overhear conversations concerning the trial during a lunch break in a local restaurant. Another affiant claimed he had been informed that during the trial jurors were permitted to go to the tavern area of the hotel where they were sequestered, and were allowed to consume alcoholic beverages and partake of entertainment offered to the general public, including dancing, live shows and regular television programming. As these affidavits were attached to Poling's motion to correct error, the proper time to hold a hearing on the issue would have been at the motion to correct error hearing. Poling specifically withdrew his request for a hearing on the motion to correct error. Therefore, the State's contention is well taken that Poling has waived this issue.

## V

Poling contends the trial court erred in refusing to grant a mistrial due to actions of the Posey County sheriff's deputies during *voir dire* of prospective jurors. He first claims he was prejudiced by being brought to the court house in jail fatigues and while in an unkempt condition. Apparently he brought street clothes with him and was allowed to clean up and put on clothing without jail markings before going into court. There was no evidence Poling had been seen by any prospective jurors before he changed clothing. In the second incident, there was a recess in the proceedings and the prospective jurors and the parties had either left or were still leaving the courtroom. Poling was in the courtroom talking to his attorney when Posey County sheriff's deputies came into the room, grabbed him, handcuffed him, and led him from the courtroom. This may have been witnessed by some of the prospective jurors.

 Denial of a motion for mistrial rests largely within the discretion of the trial court and will be reversed as an abuse of discretion only when it is shown the defendant was placed in a position of grave peril to which he should not have been subjected. *Morgan v. State* (1981), 275 Ind. 666, 671, 419 N.E.2d 964, 967. When the jury is admonished by the trial court to disregard what has occurred at trial or if

other reasonable curative measures are taken, it is unlikely refusal to grant a mistrial would be considered reversible error. *Tinnin v. State* (1981), 275 Ind. 203, 206, 416 N.E.2d 116, 118. After the second incident in the courtroom, the State indicated an admonishment to the jury would be sufficient to cure any prejudice to Poling and the trial court agreed. Poling refused to have the jury admonished. The circumstances of these incidents do not appear to have placed Poling in such grave peril that we find reversible error in the trial court's actions.

## VI

■■■■ The trial court refused to give Poling's tendered instruction number 11 which generally sought to advise the jury that when police officers testify they are entitled to no more credibility than other witnesses and their credibility is to be tested in the same manner as that of other witnesses. Poling gives no authority to the propriety of giving this instruction other than to state it is similar to Indiana Pattern Jury Instruction 12.25, which states in part the testimony of an expert should not be given any more credibility than that of a lay person simply because of his status as an expert. Refusal to give a tendered instruction is not error where the substance of the tendered instruction is covered by other instructions that are given. *Richey v. State* (1981), Ind., 426 N.E.2d 389, 395. Here, the trial court gave final instruction number 8 which fully advised the jury as to how they were to judge the credibility of all witnesses. It was therefore not reversible error to refuse to give the tendered instruction concerning police officers.

## VII

■■■■ Finally, Poling claims the trial court abused its discretion in sentencing him to sixty (60) years imprisonment. A reviewing court will not revise a sentence authorized by a statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender. A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed. Ind.R.App.Rev.Sen. 2.

■■■■ Ind.Code § 35–50–2–5 permits the trial court to increase a presumptive sentence if the court finds aggravating circumstances to justify the enhanced penalty. Guidelines for the length of sentence by the trial court are provided for in Ind.Code § 35–4.1–4–7. Pursuant to such statutes the trial court here found as aggravating circumstances: risk that Poling would commit another crime, Poling's flight following his crime, his conduct prior to arrest, demonstrating a course of conduct indicative of continuing criminal intent, and the heinousness of this crime. The court found the victim of this crime was a fifteen (15) year old girl on which unspeakable acts of brutality were perpetrated. The trial court remarked on the fact that the victim was shot in the head three times, one shot having occurred after she was dead. She was cut with a sharp instrument prior to her death and again cut after her death. The court found as mitigating circumstances the fact that Poling was of a young age, with no prior criminal record. The court found, however, that Poling's character was questionable and he had problems with school authorities. The court found Poling was in need of correctional or rehabilitative treatment that could best be provided by his commitment to a penal facility and that imposition of a reduced sentence would depreciate the seriousness of the crime. The court found the aggravating circumstances to far outweigh the mitigating ones and imposed a term of sixty (60) years. The facts in the record support the findings and judgment of the trial court. We do not find the judgment to be unreasonable to the extent he abused his discretion meriting our intervention.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, GIVAN and DICKSON, JJ., concur.