Raymond KLAGISS, Appellant–Defendant

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–9008–CR–00478.

Court of Appeals of Indiana, Fifth District.

Jan. 30, 1992.

Transfer Denied March 11, 1992.

Charles E. Johnson, Indianapolis, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

SHARPNACK, Judge.

Raymond Klagiss appeals his conviction of neglect of a dependent, a class B felony pursuant to Ind.Code § 35–46–1–4. We affirm.

Klagiss lists five issues for review, which we restate as follows:

1. Did the trial court abuse its discretion in refusing to permit the defendant's

expert witnesses to answer hypothetical questions concerning the cause of the decedent's fatal injury?

2. Did the court err in placing a video monitor in a manner that prevented Klagiss and his attorney from viewing videotaped testimony?

3. Did the court err in quashing a subpoena requesting a videotape prepared by a news organization which was not a party to this case?

4. Did inconsistencies in the testimony of one of the state's witnesses render the testimony inadmissible?

5. Is I.C. § 35–46–1–4 unconstitutionally vague?

Jadviga Klagiss and her son Raymond came to the United States in the 1950s in order to escape the rise of Communism in their native Latvia following the second world war. They eventually settled in Indianapolis, where Jadviga continued to live until her death. The defendant attended college and law school and eventually went into private legal practice in Indianapolis.

In the last years before her death, Jadviga suffered from a variety of physical problems, including osteoporosis, which were related to her advanced age. She occasionally was disoriented. In many ways, however, she was in good health and was very active for a person of her age in the last year before her death.

Klagiss moved into Jadviga's home some time before her death. Several weeks before Jadviga's death, Wayne Bruness, a former law associate of Klagiss, prepared documents deeding Jadviga's house to Klagiss and granting to him Jadviga's power of attorney.

At 3:30 a.m. on March 9, 1988, Kay Nimocks, a triage nurse at MetroHealth received a phone call from Susan Stewart (now Klagiss), a nurse with whom Klagiss was living in Jadviga's house.[1] Susan Klagiss asked Nimocks what to do with a patient who had no pulse, was not breathing, and whose fingers had turned blue. Nimocks told Susan to call the Marion

County Sheriff's Department which would notify the coroner. Susan called the sheriff's department at 4:11 a.m., some forty-one minutes after she first called Metro-Health.

A deputy coroner was summoned to the scene to investigate Jadviga's death. The coroner noticed that Jadviga's body appeared to have been posed on the bed. Klagiss, Susan, and Bruness all protested that no one had disturbed the body after Jadviga's death. The coroner also observed that the bed was soaked with urine while Jadviga's bedclothing and the bedsheets were not, that Jadviga's room was quite dirty while the rest of the house was clean, and that there were numerous cuts and bruises on Jadviga's body. One of the cuts appeared to be new but was not bleeding. In addition, a bed sore was covered with a bandage which appeared to have been applied after death. When questioned about the condition of Jadviga's body and the condition of the room, Klagiss, Susan, and Bruness were unable to give any satisfactory explanation.

The coroner's office ordered that an autopsy be performed on Jadviga's body. On external examination, the body showed twenty-one separate injuries including the laceration of the eyelid and a variety of new and old bruises. The internal examination revealed that the sixth cervical vertebra was severed and completely displaced. As a result of this displacement, the larynx was crushed, the tissues surrounding the vertebra suffered severe hemorrhaging, and the spinal cord was effectively severed.

Klagiss argues that the trial court erred when it sustained the state's objections to hypothetical questions which he posed to two of his expert witnesses. As part of his defense, Klagiss advanced the theory that Jadviga, who suffered from osteoporosis, had fractured her neck when she fell and hit her head some ten to twelve days before she died. Klagiss theorized that the

---

**1.** Klagiss and Stewart married after Jadviga's death. We shall refer to Susan Stewart Klagiss as Susan Klagiss for purposes of this opinion.

fracture of the vertebra was exacerbated when Jadviga moved in her sleep on the night of her death causing the severance and displacement of the vertebra.

In support of this theory, Klagiss offered the testimony of Drs. Kahairi and Pontius. After being qualified as an expert, Dr. Kahairi testified that osteoporosis renders bones susceptible to fracture with little trauma. Counsel for Klagiss then asked him this hypothetical question:

> All right, Doctor assuming that we have an eighty year old lady. Assume this lady has osteoporosis. Assume that a few days before her death she fell backwards from the kitchen table, on a chair, and hit her head. Assume that she seemed okay after that, was still able to move around, but for the next few days spent most of her time in bed. Assume then that a few days later this lady dies, in bed, of a broken neck. And, that the .. between C–6 and C–7, the spine is completely separated. Do you have any opinion, sir, as to how that broken neck was caused? *Also assume sir, that there was no additional trauma to the lady.*

(Record, pp. 864–865) (emphasis added). The state objected to this question alleging that it omitted relevant facts. The court sustained the objection, and defense counsel made an offer to prove in which he asserted that the doctor would testify that the neck was fractured in the fall and exacerbated by any later movement of the head. Following this offer to prove, the court stood on its earlier ruling with the following explanation:

> I think you've assumed certain things that have not been shown. Eighty year old lady with osteoporosis. Broken neck between .. or at least around the C–6. *This court has not heard that there was no additional trauma.* This court has not heard about the pushing away from the table, and the falling back, and fracturing the neck. We heard that the deceased, at some point in time pushed back. This Court has not heard that after whatever time she did that; and we don't know when it is, that she seemed okay, and could move around, though

spent most of the time in bed. Those things are not in fact, in evidence.

(Record, pp. 868–869) (emphasis added).

The defense then attempted to rephrase the question:

> Doctor, I want to assume that we have an 80 year old lady. I want you to assume that this lady had a habit of falling. And I want you to assume that this lady had osteoporosis. I want you to assume that prior to her death, she had not only fallen from a table in the ... while eating; but also that she had been caught under a bed, crawled under a bed, and been caught, and had to be helped from under the bed. Specifically want you to assume that when she fell from the table while eating, that she hit her head. I want you to assume that she was still able to ambulate, and get around after that; but that she did spend a good deal of time in bed the last couple of days of her life. And, I want to ask you that.... I want to tell you then that the lady died of a broken neck, in bed. *And I want you to assume there was no further trauma.* Can you, Doctor, render an opinion as to how that lady's neck was broken?

(Record, pp. 873–874) (emphasis added). The state again objected, and the court again sustained the objection.

Later in the trial, Klagiss offered a second expert witness, Dr. Edwin Pontius. After establishing Dr. Pontius's credentials as a pathologist, defense counsel posed the following hypothetical question:

> Sir, I want you to assume certain facts. Assume sir, that we have an 80 year old lady. Assume that this lady had a case of osteoporosis. Assume that a few days before her death, she was sitting, eating at a table. That she fell over backwards, and hit her head. That she seemed to be all right after that, and got up, and uh, was able to ambulate. Assume that a few days later she was lying in bed, and assume that the lady dies. And, assume that she died of a broken neck. Do you have an opinion, sir, as to what could have caused that broken neck?

(Record, pp. 916–917). The court sustained the prosecution's objection, and the defense made an offer to prove which the prosecution did not respond. The court did not change its ruling, and it stated, "The facts as stated in the hypothetical to Dr. Pontius, are not in evidence." (Record, p. 918).

■ The decision on whether to allow a hypothetical question falls within the sound discretion of the trial court, and we will reverse only where the trial court has abused its discretion. *Heald v. State* (1986), Ind., 492 N.E.2d 671, 678, *overruled on other grounds, Spradlin v. State* (1991), Ind., 569 N.E.2d 948. However, the defendant in a criminal case has a fundamental right to present exculpatory evidence. *Byrd v. State* (1991), Ind.App., 579 N.E.2d 457, 460. The trial court, therefore, abuses its discretion when it prevents a defendant from asking a witness a hypothetical question designed to elicit an exculpatory opinion if the witness has the knowledge, skill, education, or experience to answer the question and if there are facts in evidence to support the hypothetical. *Henson v. State* (1989), Ind., 535 N.E.2d 1189, 1191–1192 *(questioned on other grounds, Brinegar v. Robertson Co.* (1990), Ind. App., 550 N.E.2d 812, 820, Ratliff, C.J., concurring). The hypothetical is proper even if it does not include all the pertinent facts in evidence; to the extent that it omits pertinent facts, "the remedy is not exclusion of the expert's testimony but [inclusion of] such facts in questions on cross-examination." *Henson,* 535 N.E.2d at 1192. The trial court does not abuse its discretion in sustaining an objection to a hypothetical which is based on facts not in evidence. *Brandon v. State* (1979), 272 Ind. 92, 96–97, 396 N.E.2d 365, 370.

■ Here, the trial court properly sustained the state's objections to the hypothetical questions which counsel for Klagiss asked Dr. Kahairi. Both questions asked the doctor to assume that there was no trauma to Jadviga other than the supposed fall from a chair. There was no evidence, however, that this fall was the only trauma which Jadviga suffered. In fact, all the evidence presented by the defense suggested that she frequently fell and ran into things. On the record, the alleged absence of other trauma was not a fact in evidence, and the objections were properly sustained under *Brandon.*

■ We reach the same conclusion with regard to the question asked of Dr. Pontius. While that question did omit the assumption concerning the lack of other trauma, it asked the doctor to assume: 1) that an eighty year old woman; 2) with osteoporosis; 3) fell backwards while eating at a table *a few days before her eventual death;* 4) *struck her head;* 5) *initially seemed all right and was able to walk;* 6) but later, while lying in bed, died; 7) of a broken neck. Klagiss believes that Susan's testimony and his recorded statement contain facts which support each element included in this hypothetical question.

Despite the defendant's contentions, we find that there was no evidence that Jadviga fell within a few days of her death, that there was no evidence that she struck her head in the alleged fall, and that there was no evidence that she seemed "all right" after the alleged fall. In his statement, Klagiss never said that the alleged fall took place within a few days of Jadviga's death. The transcript reads:

Q. When was [the fall]?

A. This was in the last 10, 12, I can't pinpoint it right now—.

Q. —days?

A. I don't know, I don't know.

(Transcript of Recorded Statement, p. 41). In addition, Klagiss claims that Judd Green testified that Klagiss told him the alleged fall took place 10 to 12 days before Jadviga's death, and that this testimony supports the hypothetical. Green actually testified that Klagiss told him the alleged fall occurred within a two week period before the death. (Record, p. 284).

Because Klagiss never stated whether he was referring to seconds, minutes, hours, days, weeks, months, or years, we cannot say that this statement establishes any time frame for the alleged fall. Even if we were to construe the statement as urged by Klagiss, it would not support the hypothetical because the alleged fall would have

occurred at least 10 days before Jadviga's death. Under such circumstances a hypothetical which stated that the alleged fall took place a "few days" before the death was and based on a fact not in evidence. The same is true of Green's testimony. The statement that Klagiss told him that the alleged fall took place within a two week period before Jadviga's death does not support a hypothetical which is predicated in part on a fall which occurred within a "few days" of the death. The question as posed was simply misleading and based on a fact not in evidence, and the trial court did not abuse its discretion in sustaining the objection to it.

The hypothetical contained other facts not in evidence. It asked Dr. Pontius to assume that the decedent struck her head in a fall. No one testified that Jadviga struck her head in the alleged fall. Indeed, in his brief Klagiss makes no attempt to identify any testimony indicating that Jadviga struck her head. After examining the record, and in particular the recorded statement and testimony of Klagiss and the testimony of Susan Klagiss and Judd Green, we have found no statement that Jadviga struck her head in the alleged fall. Again, the trial court committed no abuse of discretion in sustaining the state's objection to a hypothetical question based on facts not in evidence.

Finally, the question asked Dr. Pontius to assume that the decedent was all right after the alleged fall. In his statement, however, Klagiss testified that Jadviga's movements were strange and her condition was "not so good" following the alleged fall. (Transcript of Recorded Statement, pp. 41–42). The hypothetical was thus based on facts not in evidence, and the trial court accordingly committed no abuse of discretion.

Klagiss next argues that the trial court committed an abuse of discretion when it denied his motion for a mistrial. Klagiss made his motion after the trial court allowed the jury to view two videotape exhibits. Klagiss complains that neither he nor his counsel were allowed to sit at the end of the jury box in order to view the tape as

it was played. He claims that the trial court's procedure deprived his counsel of the ability to object to the contents of the tapes and violated his right to confront witnesses against him as guaranteed by the federal and state constitutions. U.S. Const. amend. VI; Ind. Const. art. 1 § 13.

 The decision whether to grant or deny a motion for mistrial is committed to the discretion of the trial court. *Poling v. State* (1987), Ind., 515 N.E.2d 1074, 1080, *cert. denied,* 490 U.S. 1008, 109 S.Ct. 1646, 104 L.Ed.2d 161. We may not reverse the trial court in the exercise of its discretion unless the trial court reached a decision which was clearly erroneous—that is to say one which is against the logic and effect of the facts and circumstances of the case. *Bezy v. Loftus* (1991), Ind.App., 581 N.E.2d 965, 968. The denial of a motion for mistrial is not against the logic and effect of the facts and circumstances, and is therefore to be upheld on appeal, unless the defendant demonstrates that he was placed in a position of undue peril. *Morgan v. State* (1981), 275 Ind. 666, 671, 419 N.E.2d 964, 967.

Klagiss was not exposed to undue peril by the court's ruling denying his motion for mistrial. The record establishes without dispute that counsel for Klagiss was given the opportunity to view at least one of the tapes before trial, and Judd Green testified that counsel had viewed both tapes in Green's presence before trial. (Record, pp. 350–352).

 As we noted earlier, the state placed both tapes into evidence during the direct examination of Green. Klagiss did not object to these tapes even though he had ample opportunity to do so. He cannot now make a serious claim that he was prejudiced because he could not object when the jury viewed the tapes. If Klagiss had any objections to the admissibility of the tapes, it was his duty to make those objections known to the court at the time the tapes were offered into evidence. *Suggs v. State* (1981), Ind., 428 N.E.2d 226, 229. Because he made no objection at that time, Klagiss waived the right to object later. *Id.* A defendant may not object to

evidence which is already admitted into the record. Because the evidence was already admitted into the record, Klagiss could not make a sustainable objection and he could not have been prejudiced by a physical arrangement which arguably might have impaired his ability to object.

Klagiss also fails to show that his right to confront witnesses against him was violated when he and his attorney were prevented from sitting at the end of the jury box when his videotaped statement was shown. The confrontation clause does not bar the admission of the statement of a defendant, his co-conspirators, or his agents. *See, e.g., Montes v. State* (1975), 263 Ind. 390, 403, 332 N.E.2d 786, 794; *United States v. Gironda* (7th Cir.1985), 758 F.2d 1201, 1218–1219, *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456, *overruled on other grounds, United States v. Durrive* (7th Cir.1990), 902 F.2d 1221; *United States v. Chappell* (7th Cir. 1983), 698 F.2d 308, 312–313, *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304. Because Klagiss had no right to confront himself, the trial court committed no error when it overruled his motion for mistrial.

Klagiss next argues that the trial court deprived him of his right to compulsory process when it quashed a subpoena which he had served on WRTV, an Indianapolis television broadcaster. Klagiss sought a copy of a videotape which contained a network news report on osteoporosis. Counsel for WRTV appeared and moved to quash the subpoena because the material on the tape was not the property of WRTV, but that of Capitol Cities/ABC, the network with which WRTV was affiliated. In addition, both the state and WRTV argued that the videotape could not be authenticated and that the individuals who prepared the tape and who expressed opinions on the tape would not be available for cross-examination. Because the tape would be thus inadmissible, they argued that the subpoena should be quashed. Counsel for Klagiss argued that he intended to use the tape in cross-examining the state's experts. The trial court quashed the subpoena.

Both the federal and state constitutions guarantee criminal defendants the right to compulsory process for obtaining witnesses in their behalf. U.S. Const. amend. VI; Ind.Const. art. 1 § 13. The right to compulsory process is subject to reasonable limitations; a criminal defendant does not enjoy an absolute right to subpoena anyone or anything for any purpose. When a defendant alleges that the right to compulsory process has been unconstitutionally limited, we must make two inquiries: 1) whether the trial court arbitrarily denied the Sixth Amendment rights of the defendant, and 2) whether the witness was competent, and his testimony was relevant and material. *Davis v. State* (1988), Ind.App., 529 N.E.2d 112, 114–115 (*citing Washington v. Texas* (1967), 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019, 1025); *see, Hunt v. State* (1989), Ind. App., 546 N.E.2d 1249, 1251.

In this case we do not find that the trial court arbitrarily denied Klagiss the right to compulsory process. Because Klagiss did not attempt to subpoena the videotape until the Friday before the trial, counsel for WRTV was unable to present a written motion to quash. Instead, counsel presented an oral motion before the first day of the trial. The court heard argument from all parties, and allowed Klagiss the opportunity of make an offer to prove. Given the unique circumstances of this case, we believe that the trial court's actions were anything but arbitrary. The court took reasonable steps to determine whether the motion to quash should be granted, and we cannot say that the court arbitrarily granted the motion and denied Klagiss the right to compulsory process.

We further find that Klagiss fails to meet the second part of the test. Here, we are not concerned with the competency of a witness to testify. Instead we are concerned with a piece of evidence. Defense counsel stated that this evidence made certain assertions concerning the effects of osteoporosis. However, counsel for WRTV stated that no one at the station could authenticate the tape or any of the matters contained therein. It is obvious that no one

with personal knowledge of the making of the tape or the accuracy of its contents would be available either to verify its accuracy or to be subject to cross-examination by the state. We find this situation similar to that posed by a witness who is incompetent to testify because of a lack of personal knowledge of the events, and we find that the trial court properly granted the motion to quash.

■■■ Even if the trial court had erred, we would find the error to be harmless. Counsel for Klagiss stated that he intended to use the tape to show to the jury during the cross-examination of the state's two doctor witnesses. He stated that the tape would assert that people with osteoporosis can suffer fractures of the spine with minimal trauma, and that he intended to ask the state's doctors whether they agreed with that assertion. He thus intended to use the tape on cross-examination in the same manner one would use a learned treatise. *See, e.g., Hess v. Lowery* (1890), 122 Ind. 225, 233–234, 23 N.E. 156, 158. This tape was not, however, a learned treatise, and such cross-examination would have been improper. Because he could not have used the tape for any purpose at trial, any error in quashing the subpoena for its production was harmless.

Klagiss asserts that his conviction was procured by perjured testimony. In support of this assertion, Klagiss notes certain alleged inconsistencies in the testimony of Judd Green. We need not address these inconsistencies individually, because none even arguably tends to establish that Green perjured himself.

■■■ The state violates a defendant's rights to due process of law when it uses perjured testimony in order to procure a conviction. *Wallace v. State* (1985), Ind., 474 N.E.2d 1006, 1008. However, mere inconsistencies in the testimony of a witness do not lead to the conclusion that the witness committed perjury. *Id.* The jury is given the responsibility of resolving any inconsistencies which might exist. *Id.; Taylor v. State* (1981), Ind., 425 N.E.2d 141, 143.

Here, Klagiss identifies various matters as to which he asserts Green committed perjury. In each case, Klagiss identifies areas of arguable conflict in Green's testimony, but he has failed to show that the state knowingly presented perjured testimony. The jury obviously resolved any conflicts in Green's testimony in favor of conviction, and it is not our province to disturb its decision.

Next, Klagiss argues that the criminal neglect statute is void for vagueness. He claims that the statute is so vague and indefinite that people of ordinary intelligence could not determine what it prohibited.

■■■ In order to withstand a challenge that it is unconstitutionally vague, a penal statute must define the offense so that persons of ordinary intelligence can understand what it prohibits. *Rhinehardt v. State* (1985), Ind., 477 N.E.2d 89, 93, *overruled on other grounds, Stout v. State* (1988), Ind., 528 N.E.2d 476. The statute will pass muster if it "convey[s] [a] sufficiently definite warning as to the prohibited conduct when measured by common understanding." *Id.* The section of the neglect statute under which Klagiss was convicted reads as follows:

A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:

(1) places the dependant in a situation that may endanger his life or health;

\* \* \* \* \* \*

Commits neglect of a dependent, a Class D felony. However ... the offense is a Class B felony if it results in serious bodily injury.

I.C. § 35–46–1–4(a). The section is clear that one charged with the care of a dependant may not knowingly place that dependant in a situation which might endanger the life or health of the dependant. A person blessed with any measure of common understanding would recognize that endangering a dependant by abusing her in a manner which caused her to die of a broken neck would violate the statute. The statute is thus not void for vagueness.

 Klagiss finally challenges the sufficiency of the evidence supporting the conviction.[2] He claims that the verdict was based on mere conjecture and speculation.

When we review the evidence supporting a conviction, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Washington v. State* (1982), Ind., 441 N.E.2d 1355, 1358. Where the evidence is in conflict, we are bound to view only that evidence which is most favorable to the verdict and judgment of the trial court. *Id.* If there is any substantial evidence supporting the judgment, we must affirm. *Hutchinson v. State* (1985), Ind., 477 N.E.2d 850.

 In order to establish that Klagiss violated I.C. § 35–46–1–4(a) in the manner charged in the indictment, the state had to produce substantial evidence that he: 1) had care of his mother either voluntarily or by operation of law; 2) knowingly or intentionally; and 3) placed her in a situation which endangered her life or health by fracturing and displacing her C–6 vertebral body. In order to elevate the crime to a class B felony, the state had to prove that the neglect resulted in serious bodily injury.

Here, the state produced substantial evidence on each of these elements. Klagiss admitted that he moved in with his mother in order to care for her. The state showed that while she was in his care his mother died of a fractured neck. The state showed that the fracture would result in almost immediate death, and that Klagiss was alone with his mother immediately before she died. The state showed that Jadviga suffered numerous bruises while in the care of Klagiss, and Klagiss demonstrated that he sometimes wrenched his mother's neck in order to straighten her posture. Finally, the state showed that Jadviga's body was cleaned and repositioned after death but before the authorities were summoned.

 Klagiss offers a differing view of the evidence, one which asks this court to weigh the evidence and come to a conclusion other than that reached by the jury. As an appellate court, we may not usurp the jury's prerogative and reweigh the evidence. The evidence, and the inferences which it reasonably supports, is sufficient to sustain the conviction, and, accordingly, we find no ground for reversal here.

We have found no error, and we affirm.

AFFIRMED.

CHEZEM, J., concurs.

RUCKER, J., concurs in result.

---

**2.** Under this section of his argument, Klagiss also makes numerous complaints that the state did not attempt to elicit information favorable to his case. We simply note that the prosecution is under no obligation to negate its own case or to make a case for the defendant.