21 F.3d 430
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Raymond I. KLAGISS, Petitioner-Appellant,
v.
Clarence TRIGG, Warden of the Indiana Youth Center,
Plainfield, Indiana, Indiana Department of
Corrections, and State of Indiana,
Respondents-Appellees.
 No. 93-2510.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 4, 1994.
Decided April 15, 1994.
 
 Before FAIRCHILD, MANION and KANNE, Circuit Judges.
 
 ORDER
 
 1
 An Indiana court sentenced petitioner-appellant Raymond I. Klagiss ("Klagiss") to imprisonment after a jury found him guilty of knowingly and intentionally placing his dependent mother in a situation that endangered her life or health, which resulted in serious bodily injury, in violation of Sec. 35-46-1-4 of the Indiana Code. Another count of the information charged Klagiss with reckless homicide, but the jury could not agree.
 
 
 2
 Klagiss' conviction was affirmed on direct appeal to the Indiana Court of Appeals. Klagiss v. State of Indiana, 585 N.E.2d 674 (Ind.Ct.App.1992). The Indiana Supreme Court denied transfer, and the United States Supreme Court denied Klagiss' petition for certiorari. 113 S.Ct. 66 (1992). Klagiss then filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Indiana, which petition was denied. Klagiss appeals from the judgment of the district court.
 
 I. BACKGROUND
 
 3
 On March 9, 1988, eighty-year-old Jadviga Klagiss ("Mrs. Klagiss") died. Mrs. Klagiss' son, the petitioner in this case, had been living with her since December 1987, because she could no longer care for herself. Klagiss' girlfriend (now his wife), Susan Stewart ("Susan"), a registered nurse, also lived at the home and helped care for Mrs. Klagiss.
 
 
 4
 Gary Gray, the Marion County Deputy Coroner, was called to the Klagiss home by the Indianapolis Police Department. When he arrived just before 5:00 a.m. on March 9, he viewed Mrs. Klagiss' body in her bed. Her body had numerous bruises and small lacerations. Her body looked as though it had been cleaned up, and "neatly placed." The bedroom appeared to have recently been cleaned up; the carpet was soiled with human waste (which someone had tried to wash out), and the bed was soaked with urine. Mrs. Klagiss' clothing, however, was "fresh and clean." Gray asked Klagiss and Susan why the clothing was clean but the room was dirty, but got no satisfactory answers.
 
 
 5
 Dr. Dean Hawley, a forensic pathologist, conducted Mrs. Klagiss' autopsy. He concluded that Mrs. Klagiss died as a result of multiple blunt force injuries; her broken neck was the fatal internal injury. Mrs. Klagiss died when her neck was broken; she could not have continued to breath or eat. Her broken neck was not caused by osteoporosis.[1]
 
 
 6
 When Dr. Hawley first viewed Mrs. Klagiss, she had on a clean pajama top and a clean diaper (Mrs. Klagiss was incontinent), and there was a clean surgical dressing over a bedsore on her back. There was an open cut on Mrs. Klagiss' left eyelid, which would have bled while she was alive, but had no dried blood on it. Dr. Hawley was surprised that there was no blood on Mrs. Klagiss' clothes or in her bed, and that the bandage on her bedsore had no signs of drainage or blood.
 
 
 7
 Dr. Hawley also noted that Mrs. Klagiss' body showed a "pattern of injury"; numerous old and new injuries were not the result of falling and were not self-inflicted.
 
 
 8
 Dr. Pontius, a pathologist who testified for the defense, discussed what he believed to be discrepancies between Dr. Hawley's autopsy report and his grand jury testimony. He explained how the bruises on Mrs. Klagiss' body were not necessarily inflicted by someone. Dr. Pontius concluded that it was possible that Mrs. Klagiss' neck fracture (there was a two-inch displacement of the vertebrae) was exaggerated when her body was moved to the coroner's office.
 
 
 9
 Judd Green, a detective with the Indianapolis police department, arrived at the Klagiss home at approximately 5:30 a.m. on March 9. When Green initially interviewed Klagiss and Susan, at the Klagiss home, he asked if anything had been done to Mrs. Klagiss' body. They both answered "no," that "she had just expired in bed, and that's where they left her." R. of Proceedings, Volume II at 266. They told Green that Mrs. Klagiss' body was bruised because she fell often.
 
 
 10
 Green's notes from his initial interview with Klagiss indicated that Susan was feeding Mrs. Klagiss, who stopped breathing at 3:05 a.m. Susan attempted to clean oatmeal out of Mrs. Klagiss' throat. Susan then told Klagiss that his mother had stopped breathing; Klagiss told her to call his friend and ex-law partner, Wayne Bruness ("Bruness"). Bruness arrived at the home around 3:30 a.m.
 
 
 11
 Green testified that during his initial interview of Klagiss, Klagiss gave "extremely evasive" answers.
 
 
 12
 When Green interviewed Klagiss later that day (about 7:00 a.m.) at the police station, Klagiss said that Susan had been feeding his mother oatmeal, and that he and Susan went downstairs to put laundry in the dryer. Klagiss told Green that he thought they went downstairs together, but he might have followed after a couple seconds.
 
 
 13
 When asked about Mrs. Klagiss' broken neck, Klagiss said he had noticed that "her head had been wobbly for a few days" after she fell while sitting at a table. Id. at 272-273, 303-304. Klagiss gave Green various possible explanations for the broken neck, including that it might have happened when Mrs. Klagiss fell out of a chair, or, at times she would fall and he would grab her or pick her up, and maybe he grabbed too hard.
 
 
 14
 When Green initially interviewed Susan, she told Green that she had been feeding Mrs. Klagiss oatmeal that she had gone downstairs to put laundry in the dryer, and that Klagiss had left the room immediately after her. Susan estimated that the time of death was 3:05 a.m.
 
 
 15
 At the police station, Susan explained to Green that when they returned within five minutes from the basement to the bedroom, Mrs. Klagiss was on her last breaths. Susan said that Mrs. Klagiss was sitting up in bed, and looked at Klagiss. Green questioned the fact that Mrs. Klagiss was sitting, because she was on her back when he arrived. Susan said they had taken pillows out from underneath her head.
 
 
 16
 When Green asked why they did not call for emergency help when they realized Mrs. Klagiss was dying, Susan said, "[w]ell, I just didn't think about it." Id. at 290. She said that they performed no first aid because Mrs. Klagiss had left a note stating that she did not want artificial means to keep her alive, and they were confused and did not know what to do. Susan told Green that she first called an HMO in an attempt to reach a doctor who had seen Mrs. Klagiss previously at the HMO, so he could sign a death certificate.[2] She got an answering service, and then a return call, and was told to call the medics if Mrs. Klagiss was still breathing, and the sheriff's department if she was no longer breathing. At that time, Susan called Bruness, but did not call the medics or the sheriff's department. After Bruness came to the Klagiss house, he called the police department and requested a coroner.[3]
 
 
 17
 After Green confronted Susan with the autopsy results (i.e. that Mrs. Klagiss died from a broken neck) at the police station, Susan said that Klagiss followed her down to the basement after a few minutes, and that he was alone with his mother for awhile.
 
 
 18
 Susan testified at trial as follows. On the night Mrs. Klagiss died, she worked from 1:00 to 11:30 p.m. She returned to the Klagiss home around 12:15 a.m. Mrs. Klagiss was sleeping, and Susan and Klagiss talked until about 2:00 a.m. Susan decided they should feed Mrs. Klagiss because she had been sleeping all evening. While Klagiss was making oatmeal, Susan changed Mrs. Klagiss' diaper and cleaned and changed the dressing on her bedsore. Susan noticed no new bruises on Mrs. Klagiss. She did notice a scratch by her eye, which Susan cleaned. Klagiss and Susan propped Mrs. Klagiss up in bed, and Susan fed her oatmeal. Susan heard the washing machine with a load of her work clothes stop, so she went to the basement to put the clothes in the dryer. Klagiss was in the basement by the time she pulled the clothes out of the washer.
 
 
 19
 When they returned to Mrs. Klagiss' room, Mrs. Klagiss was gasping for breath. Susan pulled the pillows out from under her, checked her mouth, and found no oatmeal. She told Klagiss his mother was dying. She also did a sterile rub.[4] Then she called the HMO, and got an answering service; her call was returned within five to ten minutes. She was told to call the medics if Mrs. Klagiss was still breathing, and the sheriff if she wasn't. Mrs. Klagiss was not breathing then, and Susan tried to comfort Klagiss. Susan did not "attempt any life saving procedures" because Mrs. Klagiss said she did not want to be "kept alive by heroics," and there was no point in calling 911; her first worry was taking care of Klagiss. R. of Proceedings, Volume IV at 729-731. Susan called Bruness for moral support. After Mrs. Klagiss died, Susan put pillows back under her head and closed her eyes; she probably straightened her hands and the bed blankets, as she would do at work when someone dies. Bruness got to the house about a half hour after Susan called him; when he arrived, he called the coroner.
 
 
 20
 Susan testified that she did not talk to Green at the Klagiss home, other than telling him that she would come to the police station to give a statement. She denied telling Green that Klagiss was alone with his mother for several minutes. She also testified that Green threatened her at the police station.[5]
 
 
 21
 Green took a videotaped statement of Klagiss on March 10, 1988, which was played for jury. In that statement, Klagiss explained that just before her death, Mrs. Klagiss was spending a lot of time in bed, and Klagiss and Susan would get her out of bed and help her walk around for exercise. After describing how he would often attempt to straighten up his mother, Klagiss said that he may have pushed his mother's head forward to try to straighten her on March 8; he could not "remember for sure but I thought her head was floppier." Tr. of Videotaped Statement at 12. Klagiss stated that he did not remember how long it was before he followed Susan to the basement, and that he had only vague memories of many of the events surrounding his mother's death.
 
 
 22
 Klagiss testified at trial that during the last half of 1987, his mother was forgetful and weak, and fell fairly often. On March 9, when Susan left his mother's bedroom to go to the basement, he left the room right after Susan; he did not remain for two to three minutes. He did not move his mother's head in any way. Klagiss told Susan not to do CPR because his mother would not have wanted that. When asked whether her head was "wobbly" after he straightened her neck on an occasion before her death, Klagiss said not as far as he recalls.
 
 
 23
 When Detective Green asked Klagiss why he did not put his mother under professional care, he answered (before the videotaped statement) that the state would get all his mother's property. In his videotaped statement, Klagiss said that he did not want his mother to go to a nursing home because they are unacceptable. Green found that a warranty deed (prepared by Bruness) had been executed transferring ownership of the house from Mrs. Klagiss to Klagiss in February 1988. Klagiss testified that his mother frequently tried to get him to put his name on the house. He finally let her sign the deed because he felt she would be dying soon, and that it would make her happy. Additionally, if he wanted to fix up the house, he assumed that a bank would be more willing to lend him rather than his mother the money.
 
 II. DISCUSSION
 A. Constitutionality of the Statute
 
 24
 Klagiss argues that the Indiana statute he was convicted under for neglect of a dependent violates the Due Process Clause because it is unconstitutionally vague. He asserts that a reasonable person would not know what type of conduct is unlawful under the statute.
 
 The statute provides:
 
 25
 A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:
 
 
 26
 (1) Places the dependent in a situation that may endanger his life or health;
 
 
 27
 ....
 
 
 28
 commits neglect of a dependent, a Class D felony. However, ... the offense is a Class B felony if it results in serious bodily injury.
 
 
 29
 Ind.Code Ann. Sec. 35-46-1-4(a). A dependent includes "[a] person of any age who is mentally or physically disabled." Ind.Code Sec. 35-46-1-1(2).
 
 
 30
 Because the First Amendment is not involved, we examine the statute as applied to the present facts. Chapman v. United States, 111 S.Ct. 1919, 1929, 500 U.S. 453 (1991). The statute clearly encompasses the conduct Klagiss was charged with[6] and convicted of;[7] Klagiss' vagueness challenge therefore fails.
 
 B. Sufficiency of the Evidence
 
 31
 Klagiss contends that the jury was left to speculate as to whether any of his conduct contributed to his mother's death, since no witness ever saw him strike or mistreat his mother; there is no evidence that he broke his mother's neck; simply because he was in the house at the time his mother died is insufficient evidence of guilt; and, because of her osteoporosis and overall health, his mother could have broken her neck by merely turning her head.
 
 
 32
 In addressing Klagiss' claim that his conviction is not supported by sufficient evidence, this court reviews the evidence in the light most favorable to the government, and will deny relief if a rational jury could have found him guilty beyond a reasonable doubt. Ticey v. Peters, 8 F.3d 498, 500 (7th Cir.1993).
 
 
 33
 After reviewing the trial transcript, we conclude that a reasonable jury could have found Klagiss guilty beyond a reasonable doubt. Just prior to Mrs. Klagiss' death, Klagiss was alone with her for several minutes while Susan was in the basement. Dr. Hawley testified that Mrs. Klagiss died when her neck was broken, and that the break was not caused by osteoporosis. Mrs. Klagiss' body was cleaned and "posed" before the authorities were called over an hour after the death. The evidence was sufficient to convict Klagiss.[8]
 
 C. Exclusion of Expert Testimony
 
 34
 Klagiss argues that the district court improperly excluded testimony by his experts, Drs. Kahairi and Pontius, that in their opinion Mrs. Klagiss could have injured her neck when she fell backwards from the table, and the fracture was later completed with minimal turning.
 
 
 35
 The Indiana Court of Appeals decided, applying Indiana law, that the trial court had not abused its discretion in sustaining objections to the hypothetical questions asked by Klagiss' counsel,[9] because they assumed facts not in the record.[10] We do not review that conclusion. See Estelle v. McGuire, 112 S.Ct. 475, 480 (1991).
 
 
 36
 The question before us is whether these rulings violated Klagiss' federal constitutional right to present witnesses in his defense. Chambers v. Mississippi, 410 U.S. 284, 294, 302 (1973). In exercising this right, a defendant "must comply with [a state's] established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. at 302. We look to the effect on Klagiss' constitutional rights and Indiana's interests in excluding the evidence. Tague v. Richards, 3 F.3d 1133, 1138-1139 (7th Cir.1993). "Our task is to evaluate the exculpatory significance of relevant and competent evidence and then balance it against the competing state interest in the procedural rule that prevented the defendant from presenting this evidence at trial." Cunningham v. Peters, 941 F.2d 535, 538 (7th Cir.1991), cert. denied, 112 S.Ct. 1484 (1992).
 
 
 37
 Dr. Hawley testified that Mrs. Klagiss' broken neck was not caused by osteoporosis, and that she died when her neck was broken. Klagiss hoped to prove that Mrs. Klagiss' broken neck was caused in part by an earlier accident combined with movements of her own just before death.
 
 
 38
 In his videotaped statement, Klagiss described an occasion when his mother was sitting at a table. She was leaning her head back, the chair fell back, and she fell on the floor. The most favorable construction, for him, was that this occurred from ten days to two weeks before she died; there was no evidence that Mrs. Klagiss had fallen from the table a few days prior to her death.[11] The first hypothetical question, asked of Dr. Kahairi, included the assumptions that the fall occurred "a few days before her death" and that she hit her head. The second question, also of Dr. Kahairi, included the assumption that she hit her head, but did not include a time period, other than that she fell "prior to her death." The third question, of Dr. Pontius, included the assumptions that the fall occurred "a few days before her death" and that she hit her head.
 
 
 39
 It seems to us that the amount of time before death as well as the difference (in this context) between "a few days" and ten to fourteen days would be significant. The testimony also did not support the assumption that Mrs. Klagiss hit her head when she fell. Klagiss' counsel was not prevented from modifying his questions so that they conformed to the evidence, and we conclude that the rulings did not prevent him from presenting testimony of opinions based on the facts of record. Klagiss' constitutional rights were therefore not violated.
 
 D. Videotape Viewing
 
 40
 A videotape which was made on March 9, 1988, of the Klagiss home was played for the jury. Klagiss contends that he was not allowed to view this video with the jury, and therefore was deprived of his Sixth Amendment right to confront witnesses. He also questions why a duplicate and not the original tape was shown to the jury.
 
 
 41
 The defense had no objection to admitting the videotape into evidence. After the videotape was played to the jury, the defense moved for a mistrial, asserting that since Klagiss was not allowed to view the videotape contemporaneously with the jury, he had no idea what the jury had seen. The court noted that the defense had been given the tape previously, was simply making "a request to go sit by the Jury," which the court would not allow, and had only requested to sit in the bailiff's chair after the jury was in the courtroom, with no other requests.[12] Defense counsel had seen the video before trial, and he declined an offer to view the tape at break that day.
 
 
 42
 Klagiss cites to no authority supporting his position that the Sixth Amendment creates a right of a defendant to view a silent videotape, received without objection, simultaneously with the jury when the courtroom configuration does not easily lend itself to such viewing. Klagiss' counsel did not object to admission of the videotape which he previously had viewed, and did not make a timely, reasonable request to the court regarding his viewing of the videotape. Klagiss' supposition that a different videotape may have been played for the jury is not convincing. We find no constitutional error.
 
 E. Burden of Proof
 
 43
 Klagiss argues that the practical effect of the charge and instructions, given the statute's vagueness, was to compel him to prove that he did not cause his mother's death, in violation of the Due Process Clause.
 
 
 44
 The court's instructions informed the jury (1) that the state must prove beyond a reasonable doubt all material allegations of the offense charged, (2) of the elements of the offense and (3) that Klagiss is presumed innocent and therefore "is not required to present any evidence to prove his innocence, nor to prove, do, or explain anything." R. of Proceedings, Volume I at 66, 78.
 
 
 45
 In light of the instructions given the jury regarding the state's burden of proof, and finding no merit in Klagiss' argument, we conclude that the burden of proof was not improperly shifted to Klagiss.
 
 
 46
 According, we AFFIRM.
 
 
 
 [1]
 Mrs. Klagiss apparently had osteoporosis, which is a "reduction in the amount of bone mass, leading to fractures after minimal trauma." Dorland's Illustrated Medical Dictionary (27th ed. 1988)
 
 
 [2]
 Kay Nimocks, a nurse at the HMO, testified that she was on call on March 9, 1988. She was contacted by an answering service at 3:30 a.m. at home, and then returned the call. She was told that Mrs. Klagiss was probably dead; she told the caller that they should contact the sheriff's department
 
 
 [3]
 A tape research analyst for the Indianapolis Police Department testified from records that the call to the police department was received at 4:11 a.m
 
 
 [4]
 Susan explained that to perform a sterile rub, "you take your hands, and rub across their breast bone. Whenever someone starts having problems breathing, or whenever they are less alert, or conscious, that's commonly done, becau[se] it's a noxious stimuli, and it will stimulate them to do something. But, it didn't do anything." R. of Proceedings, Volume IV at 712
 
 
 [5]
 Green denies threatening Susan
 
 
 [6]
 Count II of the Information charged that Klagiss, "having the care of JUDVIGA [sic] KLAGISS, a dependent, did knowingly and intentionally place JUDVIGA [sic] KLAGISS in a situation that may endanger the life or health of JUDVIGA [sic] KLAGISS, to-wit: fracturing and displacing JUDVIGA [sic] KLAGISS' C6 vertebral body which resulted in serious bodily injury to JUDVIGA [sic] KLAGISS...."
 
 
 [7]
 The jury was instructed that one of the elements of neglect of a dependent is that the defendant's conduct resulted in serious bodily injury
 
 
 [8]
 We find that any possible inconsistency between the verdict on this count and lack of verdict on the reckless homicide count is irrelevant
 
 
 [9]
 The text of each question is quoted in the Court of Appeals' opinion, 585 N.E.2d at 678, and need not be repeated here
 
 
 [10]
 Indiana requires a hypothetical question to "embrace[ ] facts that have been placed into evidence." Henson v. State, 535 N.E.2d 1189, 1192 (Ind.1989)
 
 
 [11]
 Klagiss cites to the following:
 Q. Okay. How about up and down her back? Do you have any way of knowing if anything could have happened up and down her back? Any type of trauma or she had fallen, or anything like that?
 A. Well, she had fallen a number of times. In fact she had fallen one time, that was when she was ... I had her sitting at the dining room table; remember that round table? I had her at that end, Susan here, and I was over there. And, that was the time when she was really leaning her head back. Well, I didn't know how far it would go; and she actually fell, you know, chair fell back, and she fell in [sic] the floor.
 Q. When was this?
 A. This was in last 10, 12, I can't pinpoint it right now--.
 Q. --days?
 A. I don't know, I don't know.
 Tr. of Videotaped Statement at 40-41; "The falling out of the chair, I think that was within a two week period prior to her death...." R. of Proceedings, Volume II at 283-284 (testimony by Detective Green, recalling what Klagiss and Susan told him).
 
 
 [12]
 Once defense counsel made clear that he simply wanted to view the videotape at the same time the jury was watching it, and did not need to sit next to the jury but would stand unobtrusively in the back of the courtroom, he was allowed to so view a subsequent videotape which was played for the jury