## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Feb 25 2015, 10:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Frederick A. Turner
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

John Deckard,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent.*

February 25, 2015

Court of Appeals Case No.
53A01-1405-PC-222

Appeal from the Monroe Circuit Court

The Honorable Kenneth G. Todd, Judge

Cause No. 53C03-0903-PC-787

**Brown, Judge.**

John Deckard appeals the denial of his petition for post-conviction relief. Deckard raises three issues, which we consolidate and restate as whether the post-conviction court erred in denying his petition for relief. We affirm.

*Facts and Procedural History*

The relevant facts as discussed in Deckard's direct appeal from his conviction of felony murder for the burglary and subsequent death of Barry Scroggins follow:

> The victim, Barry Scroggins, lived in a cabin in a rural area of Monroe County, Indiana. Near Scroggins' cabin was an abandoned home at which youth from the area congregated. Defendant Deckard, then seventeen, and his friend Will Taylor, age twenty, frequented the abandoned home, often overnight. On July 27, 1991, Deckard, Taylor, and several of their friends were stranded at the home after their car broke down. That evening Deckard and Taylor left the house on foot, returning several hours later with a pickup, two pistols, and a rifle. That evening, Barry Scroggins, the victim, reported to police that someone had broken into his cabin and stolen three guns and his pickup. Deckard sold two of the guns a few days later, and, after selling parts of the truck to raise money for spirits, abandoned it. The record indicates that Deckard conducted something of a petty-crime spree over the next several days, including repeated intrusions upon Scroggins' cabin in Scroggins' absence.
>
> On August 7, 1991, Scroggins apparently met intruders at his cabin. At that meeting, Scroggins suffered a single gunshot wound, the bullet piercing his sternum. The bullet proved to be of the same caliber as one of the guns possessed by Deckard, and forensic evidence admitted at trial indicates that the bullet could have come from that weapon. Scroggins, within fifteen minutes of receiving the wound, passed on.

*Deckard v. State*, 670 N.E.2d 1, 2-3 (Ind. 1996).

[3] Later that evening, while responding to a report of gunshots being fired, police discovered Deckard driving the victim Scroggins' blue Camaro. Three other young men and a young woman were also in the car. *Id.* Stinesville Town Marshal Fred Walls asked Deckard if he had a driver's license and registration, and Deckard stated that he did not have a driver's license and said that he did not know whether there was a registration in the vehicle because the car had just been purchased by his cousin and that he had borrowed it for a couple of days. Marshal Walls asked Deckard if he had weapons in the vehicle, and Deckard indicated that he did not. Marshal Walls then asked the female in the vehicle if there were any weapons in the vehicle, and she indicated affirmatively. Marshal Walls then advised Deckard that he would like to look in the trunk, and "if he declined, we would stay there until we received a search warrant." Trial Record at 1030. Deckard then agreed to let Marshal Walls into the trunk. When the trunk was opened, Marshal Walls observed an AR-15, which is "basically a military-type weapon," and a .223 rifle, which is a "high-powered rifle," with a tripod. *Id.* at 1033.

[4] At some point, Monroe County Sheriff's Deputy Anthony Bruner arrived on the scene. Investigating officers found Scroggins' wallet, guns, and clothing in the car. *Deckard*, 670 N.E.2d at 3. After further investigation, Deckard assisted police in recovering various stolen items and was subsequently released to his grandparents. *Id.*

[5] On August 8, 1991, the police obtained a search warrant for a residence under construction. Later that day, Deckard went with his parents to the

Bloomington Police Department. *Id.* Bloomington Police Officer Daniel W. Conley informed Deckard of his rights. *Id.* Deckard and his parents waived those rights, and Deckard gave a statement admitting that he knew of Will Taylor's intent to return to Scroggins' cabin, burglarize it again, and steal Scroggins' blue Camaro, killing the owner if necessary. *Id.* Deckard also admitted helping Taylor after the killing, but denied actually participating in the murder. *Id.*

[6] At the June 1992 trial, Deckard's counsel argued during his opening statement that seventeen-year-old Deckard became friends with twenty-year-old Will Taylor and that Taylor killed Scroggins on August 7, 1991. Deckard was convicted of felony murder. *Id.* at 3. Prior to the sentencing hearing, Deckard's trial counsel filed a petition for appointment of sentencing expert to hire Dr. Jan Smith to evaluate Deckard, which the court denied. The court sentenced Deckard to sixty years imprisonment. *Id.* at 3.

[7] Deckard brought a direct appeal and his appellate counsel filed a brief on February 14, 1994. Deckard argued that the evidence was insufficient, that the prosecutor committed misconduct, that the trial court improperly denied his motion for a mistrial, that the court improperly admitted his statements to police, and that the court erred in imposing an aggravated sentence. *Id.* at 3-6. On August 7, 1996, the Indiana Supreme Court affirmed. *Id.* at 6.

[8] On March 26, 2009, Deckard, *pro se*, filed a petition for post-conviction relief. Deckard argued that his trial counsel and appellate counsel were ineffective.

Specifically, Deckard argued that his trial counsel was ineffective for failing to file a pretrial motion to suppress, object to the introduction of 404(b) evidence, and move for dismissal or discharge for a lack of probable cause in support of the arrest warrant. Deckard alleged that his appellate counsel failed to properly litigate the admissibility of Deckard's statements to police officers and failed to raise the introduction of 404(b) evidence. In 2009, the State filed an answer and an amended answer that alleged in part that relief should be denied due to *laches* and/or *res judicata*.

[9] On December 30, 2011, Deckard, represented by counsel, filed an amended petition for post-conviction relief. Deckard alleged that his conviction was based primarily on evidence obtained after an illegal and unconstitutional search of his vehicle, that statements and evidence were procured from Deckard, who was then seventeen years old, after his arrest without the consultation of either parent. Deckard asserted that his trial counsel did not object to this evidence. Deckard also asserted that the trial court's denial of his trial counsel's request for funds for a sentencing expert violated his constitutional rights under both the United States and Indiana Constitutions. He also asserted that appellate counsel was ineffective for not raising this issue on direct appeal.

[10] On April 4, 2013, Deckard filed a second amended petition for post-conviction relief. In part, Deckard alleged that the denial of funds for a sentencing expert denied him his fundamental rights to the extent that it denied him the effective assistance of counsel.

[11] On April 4, 2013, the court held a hearing on Deckard's petition. At the hearing, Marshal Walls testified regarding the August 8, 1991 traffic stop. Petitioner's Exhibit 1 consists of a map that includes Gosport and according to Marshal Walls's testimony Moon Road.[1] Deckard's counsel asked Marshal Walls to make either an X or a circle on the section of Moon Road that he believed the shots were coming from. The X on Petitioner's Exhibit 1 is on a portion of Moon Road between the location where Moon Road dead-ends to the north and where West Sand College Road meets Moon Road to the south. Deckard's counsel asked Marshal Walls to put a P where he pulled the car over. Petitioner's Exhibit 1 does not contain a clear indication that a P was marked. Marshal Walls stated: "It was just north of Sand College, where I don't, I don't recall." *Id.* at 9. On redirect examination, Deckard's counsel asked Marshal Walls to mark the intersection where he met Marshal Hall with an H. Petitioner's Exhibit 1 appears to contain an H near where Moon Road and W. Wampler Road meet. It is unclear whether the H was written over a P.

[12] According to Marshal Walls, he received a report around ten, eleven, or twelve at night on August 7, 1991 from the town marshal in Gosport in reference to

---

[1] The map does not identify any roadway as Moon Road, but Marshal Walls identified Moon Road on the map by placing an X on it.

high-powered weapons being fired over the river into the town of Gosport and that the shots were coming from the Moon Road area. Marshal Walls testified that Moon Road was not paved in 1991, was narrow, dead-ended at the river, and was not a high traffic area. The area of Moon Road that dead-ends was something that "kids, teenagers, twenty-somethings use to go back and drink beer by the creek, or by the river." Post-Conviction Transcript at 18. Marshal Walls did not see any other vehicular traffic while he was on the road just prior to the stop of the vehicle driven by Deckard and he did not expect to see other traffic.[2] Marshal Walls testified that he was driving north on Moon Road and stopped the first vehicle that he saw on Moon Road. When asked where he first made contact with the vehicle driven by Deckard, Marshal Walls said it was "[j]ust north of Sand College" Road, which according to the map and testimony is the first road that meets Moon Road south of where Moon Road

---

[2] The following exchange occurred during cross-examination of Walls:

> Q Alright. Would you have expected to see any other vehicular traffic given what you knew about traffic patterns in that area?
>
> A Well, no I wouldn't expect it, you never know, you know.

Post-Conviction Transcript at 13.

dead-ends.[3] *Id.* at 9. On redirect examination, Marshal Walls testified that he met Marshal Hall on Wampler Road and Moon Road.

[13] Deputy Sheriff Jeff Brahaum testified regarding the stop and the aftermath. Deckard's trial counsel testified that he did not think that he filed any kind of motion to suppress the evidence seized from the traffic stop. When asked whether there was a strategic reason for not filing a motion to suppress, he answered: "I don't know what reason there would be. I don't remember." *Id.* at 37. On cross-examination, the prosecutor asked how trial counsel would characterize the state of his memory with respect to this case, and trial counsel stated: "It's been too long ago, I don't remember details." *Id.* at 45. Deckard's sister, Dr. Michael Kane, and Deckard also testified.

_____

[3] On direct examination of Marshal Walls, the following exchange occurred:

> Q Now back to Petitioner's Exhibit 1, the map, when did you first make contact with the car driven by John Deckard that night?
> A If I recall it was just past Sand College.
> Q Just south of Sand College?
> A Just north of Sand College.

Post- Conviction Transcript at 8-9.

On February 26, 2014, the court denied Deckard's petition in a twenty-four page order. The court found that Deckard had not demonstrated that his trial counsel and appellate counsel were ineffective. The court also found that the State had not met its burden with respect to the claim of *laches*. On March 28, 2014, Deckard filed a motion to correct error. On April 24, 2014, the court denied Deckard's motion to correct error.

## *Discussion*

Before discussing Deckard's allegations of error, we observe that the purpose of a petition for post-conviction relief is to raise issues unknown or unavailable to a defendant at the time of the original trial and appeal. *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006). A post-conviction petition is not a substitute for an appeal. *Id.* Further, post-conviction proceedings do not afford a petitioner a "super-appeal." *Id.* The post-conviction rules contemplate a narrow remedy for subsequent collateral challenges to convictions. *Id.* If an issue was known and available but not raised on appeal, it is waived. *Id.*

We also note the general standard under which we review a post-conviction court's denial of a petition for post-conviction relief. The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence. *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004); Ind. Post-Conviction Rule 1(5). When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Fisher*, 810 N.E.2d at 679. On review, we will not reverse the judgment unless the evidence as a whole unerringly and unmistakably leads

to a conclusion opposite that reached by the post-conviction court. *Id.* Further, the post-conviction court in this case entered findings of fact and conclusions thereon in accordance with Indiana Post-Conviction Rule 1(6). "A post-conviction court's findings and judgment will be reversed only upon a showing of clear error – that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* In this review, we accept findings of fact unless clearly erroneous, but we accord no deference to conclusions of law. *Id.* The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id.*

[17] Deckard argues that: (A) his trial counsel and appellate counsel were ineffective; and (B) the trial court denied his constitutional right to present evidence when it denied him funds and the opportunity to have a complete evaluation.

A. *Ineffective Assistance*

[18] Generally, to prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both that his counsel's performance was deficient and that the petitioner was prejudiced by the deficient performance. *French v. State*, 778 N.E.2d 816, 824 (Ind. 2002) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), *reh'g denied*). A counsel's performance is deficient if it falls below an objective standard of reasonableness based on prevailing professional norms. *French*, 778 N.E.2d at 824. To meet the appropriate test for prejudice, the petitioner must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Perez v. State*, 748 N.E.2d 853, 854 (Ind. 2001). Failure to satisfy either prong will cause the claim to fail. *French*, 778 N.E.2d at 824. Most ineffective assistance of counsel claims can be resolved by a prejudice inquiry alone. *Id.* We apply the same standard of review to claims of ineffective assistance of appellate counsel as we apply to claims of ineffective assistance of trial counsel. *Williams v. State*, 724 N.E.2d 1070, 1078 (Ind. 2000), *reh'g denied*, *cert. denied*, 531 U.S. 1128, 121 S. Ct. 886 (2001).

[19] When considering a claim of ineffective assistance of counsel, a "strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Morgan v. State*, 755 N.E.2d 1070, 1072 (Ind. 2001). "[C]ounsel's performance is presumed effective, and a defendant must offer strong and convincing evidence to overcome this presumption." *Williams v. State*, 771 N.E.2d 70, 73 (Ind. 2002). Evidence of isolated poor strategy, inexperience, or bad tactics will not support a claim of ineffective assistance of counsel. *Clark v. State*, 668 N.E.2d 1206, 1211 (Ind. 1996), *reh'g denied*, *cert. denied*, 520 U.S. 1171, 117 S. Ct. 1438 (1997). "Reasonable strategy is not subject to judicial second guesses." *Burr v. State*, 492 N.E.2d 306, 309 (Ind. 1986). We "will not lightly speculate as to what may or may not have been an advantageous trial strategy as counsel should be given deference in choosing a trial strategy which, at the time and under the circumstances, seems best." *Whitener v. State*, 696 N.E.2d

40, 42 (Ind. 1998). In order to prevail on a claim of ineffective assistance due to the failure to object, the defendant must show a reasonable probability that the objection would have been sustained if made. *Passwater v. State*, 989 N.E.2d 766, 772 (Ind. 2013) (citing *Wrinkles v. State*, 749 N.E.2d 1179, 1192 (Ind. 2001), *cert. denied*, 535 U.S. 1019, 122 S. Ct. 1610 (2002)).

[20] Ineffective assistance of appellate counsel claims fall into three categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Bieghler v. State*, 690 N.E.2d 188, 193-195 (Ind. 1997), *reh'g denied*, *cert. denied*, 525 U.S. 1021, 119 S. Ct. 550 (1998). To prevail on a claim about appellate counsel's failure to raise an issue, the first prong of the *Strickland* test requires the claimant to show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy. *Carter v. State*, 929 N.E.2d 1276, 1278 (Ind. 2010). We "consider the totality of an attorney's performance to determine whether the client received constitutionally adequate assistance." *Bieghler*, 690 N.E.2d at 194.

### 1. *Traffic Stop and Search*

[21] Deckard argues that his trial counsel was ineffective for not filing a motion to suppress or making a contemporaneous objection to evidence seized pursuant to the traffic stop. He argues that the State's entire case from the murder weapon to the evidence about the prior burglaries was discovered as a result of

the stop. He argues that Marshal Walls did not have reasonable suspicion that criminal activity was or had been committed by Deckard. He claims that there was no evidence that the shooting occurred on Moon Road, that the shooters were driving a vehicle, or that the shooters had left the area of the shooting. Deckard points out that Marshal Walls testified at the post-conviction hearing that the reason he stopped the vehicle was because it was the first vehicle he saw on Moon Road. He asserts that the traffic stop was unconstitutional under the Fourth Amendment of the United States Constitution because Marshal Walls "had no description of the vehicle, no knowledge that the shooters had left the river area or were in a vehicle, and no particularized suspicion for the vehicle he stopped." Appellant's Brief at 5. Without citation to the record, Deckard asserts that he was a minor at the time of the traffic stop and consented to the search of the trunk without any parental consultation. He asserts that Marshal Walls testified at the trial that if Deckard declined his request to look in the trunk they would stay there until a search warrant was received. He argues that the consent to search the vehicle was not voluntary and was not reasonable under Article 1 Section 11.

[22] The State argues that the reported conduct of gunshots constituted criminal recklessness and that the post-conviction court's finding that the area was secluded and irregularly frequented is supported by evidence that "shots were fired near midnight; the area of Moon Road from which the shots were fired was a dead-end road; that Moon Road was unpaved; that only one or two houses may have been situated along Moon Road at the time; [and] that only

two roads enter onto Moon Road, neither of which continues past Moon Road to some other location." Appellee's Brief at 18. The State asserts that the facts and inferences available to Marshal Walls showed that the first such car may well have contained the individual or individuals who had been firing into Gosport, and that Deckard's vehicle "was seen and stopped *north* of the junction of Moon Road and West Sand College Road." *Id.* To the extent that Deckard mentions Article 1, Section 11 of the Indiana Constitution, the State asserts that the rule of *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005), which is cited by Deckard, and its progeny are not retroactively applicable to Deckard's case and that, both before and after *Litchfield*, Indiana applied the standard in *Terry v. Ohio*, 392 U.S. 1 (1968), to claims that an investigatory stop was unreasonable under Article 1, Section 11.

[23] The post-conviction court found:

> Deckard challenges the search of the blue Camaro at the site of the Moon Road stop on two bases, as the Court understands his argument. He contends that Deputy Wall[s] had no reasonable suspicion to stop the blue Camaro in the first place. He also contends that the search of the Camaro violated his constitutional right to be free from unreasonable search and seizure.
>
> As stated in Deckard's proposed findings of fact, Deputy Walls proceeded to the Moon Road area after receiving a report from the Gosport Town Marshal of rapid-fire gunshots from the area which resulted in bullets striking the tree tops in Gosport. That report from another police officer warranted Deputy Wall[s]'s assistance in investigating what reasonably appears to have been an act of criminal recklessness. When Walls and the Gosport Town Marshal arrived at the Moon Road location minutes later, they observed a vehicle approaching from the area from which the shots were believed to have

been fired.  The vehicle was approaching on a dead-end road which terminated in the area from which the shots which had been heard were believed to have originated, approximately 300 to 400 yards from where the stop was effected (Kelley, page 1708).  There were no houses on that road which was located in an isolated area utilized upon occasion by under-aged drinkers.

Wall[s]'s decision to stop the blue Camaro was not an unparticularized hunch, but based on a reasonable suspicion that the occupants of the sole vehicle leaving that area were those who had fired the shots which struck tree-tops in Gosport.  Walls and the Gosport Town Marshal had a sufficient basis to conduct an investigatory stop of the vehicle to further investigate that act of criminal recklessness.  [*Finger v. State*], 799 N.E.2d 528, [5]33-[5]34 (Ind. [] 2003); [*Bridgewater v. State*], 79[3] N.E.2d 1097, 1100 (Ind. Ct. App. 2003)[, *trans. denied*]; [*State v. Renzulli*], 958 N.E.2d 1143, 1146-1147 (Ind. [] 2011)[.]

After the stop was effected, Wall[s], pursuing the matter which he was investigating, asked the occupants if there were guns in the vehicle. Deckard denied that there were, but Kelley and /or Greene quickly contradicted him and said that there were, in fact, guns in the trunk. Walls asked that the trunk be opened, advising the occupants that if they did not do so, a search warrant would be requested.  Deckard then opened the trunk.

Assuming, for the moment, the right to object, none of the occupants of the blue Camaro were in custody and no [*Pirtle*] warning was required.  ([*Sellmer v. State*], 842 N.E.2d 358, 363, Ind. [] 2006; [*Miller v. State*], 846 N.E.2d 1077, 1081, Ind. Ct. App. 2006, trans. den.)

Deckard voluntarily opened the trunk and, had he not, Walls had probable cause to believe that the trunk contained evidence related to the shots fired into the town of Gosport.

However, that aside, Deckard had no standing to object to the search of the stolen vehicle as he had no reasonable expectation of privacy which attached to it and could demonstrate no legitimate right to ownership of, control over, possession of, or interest in the car or the guns in the trunk.  [*Campos v. State*], 867 N.E.2d 686, 679-681 (Ind. Ct.

App. 2007)[, *trans. granted*, 885 N.E.2d 590 (Ind. 2008)[4]]; [*State v. Lucas*], 859 N.E.2d 1244, 1249 (Ind. Ct. App. 2007)[, *reh'g denied, trans. denied*]; [*DeBerry v. State*], 659 N.E.2d 665, 670 (Ind. Ct. App. 1995); [*Mendelvitz v. State*], 416 N.E.2d 1270, 1274 (Ind. Ct. App. 1981)[.] To challenge the search, Deckard must "establish ownership, control, possession, or interest in either the premises searched or the property seized prior to challenging the illegality" of the search. [*Peterson v. State*], 674 N.E.2d 528, 533-534 (Ind. [] 1996)[, *reh'g denied, cert. denied*, 522 U.S. 1078, 118 S. Ct. 858 (1998).] This he did not do and could not do. [*DeBerry*], supra; [*Mendelvitz*], supra.

Deckard's contention that the performance of either of, or both, his trial attorney or appellate attorney was deficient for failing to challenge either the investigatory stop of the blue Camaro on Moon Road or the search of the blue Camaro is without merit.

Appellant's Appendix at 157-158 (paragraph indents omitted).

[24] In addressing Deckard's claims of ineffective assistance, we focus on case law present at the time of the trial and direct appeal. *See Garrett v. State*, 992 N.E.2d 710, 724 (Ind. 2013) (holding that appellate counsel cannot be held ineffective for failing to anticipate or effectuate a change in existing law); *Reed*, 856 N.E.2d at 1197 (holding that an ineffective assistance claim cannot be based upon counsel's failure to argue legal reasoning of cases not yet decided at the time of

---

[4] In *Campos v. State*, 885 N.E.2d 590, 598 (Ind. 2008), the Court held that to challenge a search a defendant must establish ownership, control, possession, or interest in the premises searched and must show a subjective and objective expectation of privacy in the premises.

appeal); *Singleton v. State*, 889 N.E.2d 35, 41 (Ind. Ct. App. 2008) (holding that the relevant inquiry when determining whether an attorney rendered deficient performance is whether his or her performance fell below an objective level of reasonableness based upon prevailing professional norms and examining the case law available to petitioner's counsel at the time of trial and at the time of his direct appeal).

[25] The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." A police officer may make an initial or investigatory stop of a person or automobile under circumstances where probable cause for arrest is lacking when the facts known to the officer at the time of the stop are such as to warrant a man of reasonable caution to believe an investigation is appropriate. *Poling v. State*, 515 N.E.2d 1074, 1077 (Ind. 1987) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968); *Taylor v. State*, 273 Ind. 558, 561, 406 N.E.2d 247, 250 (1980)), *cert. denied*, 490 U.S. 1008, 109 S. Ct. 1646 (1989). Under the Fourth Amendment, a police officer who lacks probable cause but whose observations lead him reasonably to suspect that a particular person is committing a crime may detain that person briefly in order to investigate the circumstances that provoke suspicion. *State v. Pease*, 531 N.E.2d 1207, 1210 (Ind. Ct. App. 1988). Although stopping a car and

detaining its occupant constitutes a seizure within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh the Fourth Amendment interest of the occupant in remaining secure from the intrusion. *Id.*

[26]	Article 1, Section 11 provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." In *Rutledge v. State*, 426 N.E.2d 638, 641 (Ind. 1981), the Indiana Supreme Court addressed an argument that a stop of a vehicle was in violation of the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution and held that "[i]n order to determine the reasonableness of such a warrantless intrusion, the court must examine the facts known to the officer at the time he stopped the car, and determine from those specifically articulable facts, and reasonable inferences from them, whether they reasonably warrant a suspicion of unlawful conduct."

[27]	Deckard argues that "Walls testified at trial and at the PCR hearing that they stopped the vehicle on Moon Road between Sandy College Road and Wampler Road." Appellant's Brief at 5. Deckard cites Petitioner's Exhibit 1 and portions of Marshal Walls's testimony at the post-conviction hearing. However, in the portions of testimony to which Deckard cites, Marshal Walls testified that he first made contact with Deckard's vehicle "[j]ust north of Sand College" and that he first saw the vehicle "[j]ust north of Sand College." Post-Conviction Transcript at 9.

[28] Based upon his testimony and Petitioner's Exhibit 1, Marshal Walls believed that shots were being fired from the portion of Moon Road north of the point where it met West Sand College Road. Moon Road was not paved in 1991, was narrow, dead-ended at the river, and was not a high traffic area. Marshal Walls made contact with the car driven by Deckard north of West Sand College Road, which would be the portion of Moon Road between where Moon Road dead-ended in the north to where the first access off of Moon Road is available by West Sand College Road. Deckard does not argue and did not question Marshal Walls regarding the length of the delay between the time of the shots and the time of the stop. We cannot say that the evidence as a whole unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court.

[29] Deckard cites *State v. Barker*, 734 N.E.2d 671 (Ind. Ct. App. 2000), and *Daniel v. State*, 582 N.E.2d 364 (Ind. 1991), *reh'g denied*, *cert. denied*, 506 U.S. 838, 113 S. Ct. 116 (1992), for the idea that the consent to search the vehicle was involuntary. Both cases addressed the Fourth Amendment and dealt with officers indicating that they could obtain a search warrant. *See Daniel*, 582 N.E.2d at 369 (holding that the admission of evidence relating to appellant's fingerprints was not error where detective's advisement regarding a warrant to obtain fingerprints to be that one would be sought rather than routinely obtained); *Barker*, 734 N.E.2d at 673 (holding that the officers' statement "they could go get a search warrant if they were not allowed inside" was troubling). However, neither case dealt with stolen property.

[30] Here, the post-conviction court's order stated Deckard had no standing to object to the search of the stolen vehicle as he had no reasonable expectation of privacy which attached to it and could demonstrate no legitimate right of ownership of, control over, possession of, or interest in the car or the guns in the trunk. Deckard does not specifically challenge the post-conviction court's analysis in this regard. We cannot say that the post-conviction court erred. *See DeBerry v. State*, 659 N.E.2d 665, 670 (Ind. Ct. App. 1995) (holding that the defendant had no standing to object to the search of a stolen automobile as he had no legitimate expectation of privacy in a stolen automobile) (citing *Mendelvitz v. State*, 416 N.E.2d 1270, 1274 (Ind. Ct. App. 1981) (holding that "if we were to assume, *arguendo*, the search was unlawful, [defendant] has no legitimate expectation of privacy or any other personal, proprietary, or possessory interest in the stolen automobile, the violation of which would invoke the exclusionary rule").

### 2. *Search Warrant*

[31] Deckard argues that his trial counsel and appellate counsel were ineffective for not having raised the issue of the unsupported search warrant issued on August 8, 1991. He contends that the warrant contains no cause number nor does it reference any affidavit or hearing, that the record is void of any supporting evidence for the issuance of the search warrant, that the lack of an affidavit or a hearing makes it impossible for anyone to determine whether probable cause existed, and that had trial counsel raised this issue through a motion to suppress and contemporaneous objection at trial, the motion would have been granted.

[32]    The State argues that to prevail Deckard must show that no sworn evidence was presented in support of the warrant in the first place and that Deckard failed to do that. The State asserts that it is entirely possible that the sworn application for the warrant rests with the judge that issued the search warrant. The State also points out that Deckard did not inquire into this issue with his trial counsel and did not ask Deputy Brahaum about the process used to obtain the search warrant.

[33]    The post-conviction court found:

> On August 8, 1991, a search warrant was issued by the Honorable Douglas R. Bridges of the Monroe Circuit Court for what was described as "a residence under construction located approximately 1 mile east of 2001 McGowan Road." It is apparent, as conceded by Deckard in his proposed findings of fact and conclusions of law, that the subject of the search warrant was the abandoned house at which Deckard, Taylor, and their friends spent time.
>
> The Indiana State Police and / or Monroe County Sheriff's Department officers did execute the warrant and seize a number of items there, including three knives, five compact discs, a box of .45 caliber ammunition, a box of .22 caliber ammunition, some shell casings, and other assorted items.
>
> Deckard contends that his trial attorney should have filed a motion to suppress the fruits of that search. It is accurate that, for reasons unexplained, the record of proceedings does not contain an affidavit or transcript of testimony supporting the request for the warrant. However, the absence of an affidavit or testimony in support of that request might have as much material bearing on the State's defense of laches as any other issue before the Court.
>
> Most of the items seized were not admitted as evidence at trial and it is not apparent to the Court that the admitted items, other than possibly the box of .45 caliber ammunition could have much weight bearing on

the determination of Deckard's guilt or innocence on the charged offense of murder.

However, of greater, and controlling, significance is the fact that Deckard did not claim, and, in fact, had no, right of "ownership, control, possession, (or) interest" in the abandoned house. He was a trespasser at the abandoned house and thus lacked any "legitimate right" to object to the search of that location. [*Allen v. State*], 893 N.E.2d 1092, 1100 (Ind. Ct. App. 2008)[, *reh'g denied*, *trans. denied*]; [*Livingston v. State*], 542 N.E.2d 192 (Ind. [] 1989)[.] Nor does he claim a legitimate expectation of privacy in anything in the house. Therefore, he could not challenge the search of the abandoned house nor the seizure of items from it.

Deckard's contention that the performance of either his trial attorney or appellate attorney was deficient for failing to the [sic] search of the abandoned house is without merit.

Appellant's Appendix at 156-157 (paragraph indents omitted).

[34] At the time of the offense and search warrant, Ind. Code § 35-33-5-2 provided that no search warrant shall be issued until there is filed with the judge an affidavit setting forth certain details. However, Deckard does not point to the record to demonstrate that an affidavit was never completed or that he asked Deputy Sheriff Brahaum whether an affidavit had ever been completed. On cross-examination, Deputy Sheriff Brahaum testified that the evidence from the cases still exists but "as far as case reports, search warrants, all the paperwork stuff has been, is gone." Post-Conviction Transcript at 32-33. Moreover, Deckard does not develop an argument that he had any interest in the abandoned house or claim an expectation of privacy in anything in the house. We cannot say that reversal is warranted on this basis.

### 3. *Deckard's Juvenile Status*

[35] Deckard appears to focus on Ind. Code § 31-6-7-3 which provided for consultation by a child with his parents.[5] Deckard argues that "the atmosphere of being a 17 year old, alone, stopped and detained by law enforcement, is not a relaxing atmosphere" and "[i]t is exactly the kind of situation that the statute was meant to provide protection for the juvenile." Appellant's Brief at 11. We had difficulty parsing Deckard's arguments. The title of this section in his brief appears to focus on the effectiveness of appellate counsel as it is titled:

---

[5] At the time of the offense, Ind. Code § 31-6-7-3 provided in part:

> (a) Any rights guaranteed to the child under the Constitution of the United States, the Constitution of Indiana, or any other law may be waived only:
>
>> (1) by counsel retained or appointed to represent the child, if the child knowingly and voluntarily joins with the waiver; or
>>
>> (2) by the child's custodial parent, guardian, custodian, or guardian ad litem if:
>>
>>> (A) that person knowingly and voluntarily waives the right;
>>>
>>> (B) that person has no interest adverse to the child;
>>>
>>> (C) meaningful consultation has occurred between that person and the child; and
>>>
>>> (D) the child knowingly and voluntarily joins with the waiver.

(Subsequently repealed by Pub. L. No. 1-1997, § 157 (eff. July 1, 1997)).

"Deckard's Appellate Counsel was ineffective for not having raised the issue of the admission of evidence obtained after the stop and objected to by trial counsel." *Id.* at 9. In the argument section, he appears to assert that his trial counsel and appellate counsel were both ineffective.

[36]  Deckard contends that he "told and showed Deputy Brahaum and Detective Bruner the location [of] Barry Scroggins' (decedent) stolen truck, Scroggins' neighbor's stolen, [sic] motorcycle and the abandon [sic] house where evidence was retrieved." *Id.* at 10. He asserts that trial counsel "made an attempt to keep out the 404(b) but never made an attempt to suppress the evidence." *Id.* (citing "Rec.App.p. 1673-1674").[6] Without citation to the record, he claims that his trial counsel "did object to some of the evidence through Officer Conley but that was overruled." *Id.* He argues that "[a]ppellate counsel was ineffective for not raising Trial Counsel's objection in the appeal." *Id.* at 11. However, Deckard does not specify what objection his appellate counsel was ineffective for failing to raise. In the conclusion section of his brief, he argues that his

---

[6] On pages 1673-1674 of the trial record, Deckard's trial counsel did not specifically mention Rule 404(b). Rather, he objected to the admission of "the statement of John Deckard, chapters one and two" based upon "the Fifth Amendment, Sixth Amendment and Fourteenth Amendment of the U.S. Constitution, Article I, Section 12, 13 and 14 of the Indiana Constitution." Trial Record at 1673. Trial counsel also argued: "Our argument is under 31-6-7-3, the Indiana juvenile provisions, that no meaningful consultation was allowed in the initial contact between Mr. Deckard and Officer Brahaum, the matters overlap, tainting as fruit of the poisonous tree, any subsequent statement taken by Conley or taken at the Monroe County Prosecutor's Office." *Id.*

appellate counsel was ineffective for not arguing that his objection to evidence based on his lack of meaningful consultation with a parent at the scene of the traffic stop should have been sustained. Lastly, he asserts that his trial counsel "did not argue that the **evidence** obtained by the custodial interrogation that immediately followed the traffic stop and lasted until 8:00 AM the next day, should not have been admitted into evidence" and that "Trial Counsel was ineffective for not filing a motion to suppress the evidence of the truck, the motorcycle, and the items taken from the abandon [sic] house." *Id.*

[37]  The State argues that the admissibility of Deckard's communications to police was not only known and available during his direct appeal, but actively raised and litigated in that appeal. The State also argues that Ind. Code § 31-6-7-3 applies to the custodial interrogation of juveniles, that when a juvenile deceives officers about his age the juvenile's statement will be admitted because the deceit relieved officers of their obligation to observe the statute, and that Deckard told the officers that he was born on December 1, 1972, which would have made him eighteen years old. The State also argues that the evidence that Deckard took Officer Bruner to the motorcycle's location was admitted by Deckard's trial counsel during cross-examination of Officer Bruner, that evidence regarding Deckard taking Deputy Brahaum to the pickup truck was introduced, and that this was reasonable strategy given Deckard's later confession.

[38]  In his reply brief, without citation to the record, Deckard posits that the State's argument concerning the defense's admission of the motorcycle and the pickup

truck is inapposite, that "[t]his may have been legitimate trial strategy if you're not contesting the admission of the evidence," and that "[b]ecause Trial Counsel put himself in the position to make this a legitimate trial strategy doesn't mean that Trial Counsel should not have objected to the entirety of Deckard's statements." Appellant's Reply Brief at 4.

[39] The post-conviction court found:

> It is clear from the evidence that none of the officers at the Moon Road location had any reason to suspect that a homicide had been committed, though they did have reason to believe that the blue Camaro was a stolen vehicle and suspected that the guns in the trunk of that vehicle might be stolen. They also had reason to believe that Deckard, a minor, had consumed alcoholic beverages and that he had been involved in the firing of the shots over the town of Gosport. However, it is also clear from the evidence that they had no interest in pursuing either of the latter two potential charges.
>
> Brahaum did not advise Deckard of his [*Miranda*] rights at the Moon Road location. (Brahaum, page 2357) (Nor does the evidence reveal that any other officer did so.) Brahaum testified that he did not advise Deckard of his rights because he denied any involvement in the July 27, 1991, burglary of the Scroggins residence, the theft of Scroggins's Camaro, or the guns in the trunk of the Camaro. Rather, Deckard originally told Brahaum that the vehicle had been loaned to him by someone else. (Brahaum, page 2330). And he initially stated that the guns, concerning which the officers had no corroborating evidence were actually stolen, had been loaned to him by someone else. (Brahaum, Investigative Narrative, page 235) At that point, Brahaum said Deckard "gave him several stories. He had me going pretty good." (Brahaum, page 2331)
>
> Subsequently, Brahaum asked Deckard who had taken the truck, if he had not done so. Deckard told Brahaum that he knew where the truck was located and who had taken it, identifying those subjects as Matt (presumably Daugherty) and Greg (presumably Saunders). (Brahaum,

page 2330; Brahaum, Investigation Narrative, page 235)

Brahaum asked Deckard, "Would you mind showing me (where the truck is located?" Deckard agreed to do so. (Brahaum Deposition, page 579[)]

From the time of the stop of the blue Camaro on Moon Road by Walls during the late evening hours of August 7, 1991, Deckard was perceived by the investigating officers as a material witness to the July 27, 1991, burglary of the Scroggins residence, the theft of the Snapp motorcycle, and the suspected theft of the blue Camaro and the guns in its trunk. (Bruner, pages 1644-1649; Brahaum, Investigative Narrative, page 235; Brahaum, Deposition, page 579)

While both the trial prosecutor and trial defense counsel argued their positions based on the assumption that statements made by Deckard at the Moon Road investigatory stop and thereafter were in the context of custodial interrogations, there is no evidence which supports that conclusion.

At the scene of the Moon Road stop, none of the occupants of the blue Camaro were placed under arrest or handcuffed (notwithstanding Hughes's deposition speculation to the contrary, Hughes, Deposition, pages 672-673)

Deckard submitted proposed findings of fact which included a finding that he was handcuffed when Brahaum questioned him about the July 27, 1991, burglary and the State agreed with that proposed finding. However, the only testimony which could be considered favorable to Deckard's proposed finding of fact is Brahaum's hearing testimony that he could not recall twenty-two (22) years later if Deckard was handcuffed when questioned on Moon Road about the July 27, 1991, burglary. That was one of a number of salient details of which Brahaum now has no independent memory.

The Court has diligently searched the record and has found no direct or inferential evidence supporting that proposed finding. There was no such evidence either in the record of the case or in any of the deposition testimony or in the investigative narratives of the investigating officers that Deckard or any other person at the Moon

Road investigative stop was ever placed under arrest or handcuffed.

Deputy Bruner testified on cross-examination that he would not have allowed Deckard to leave the area due to evidence that Deckard, a minor, was in possession of alcohol or had consumed alcohol. Rather, Bruner testified that he would have taken Deckard to his parents and cited him into court. (Bruner, page 1649). However, Deckard was, if [sic] fact, allowed to leave the scene of the stop. He first voluntarily accompanied Brahaum and another deputy to assist the officers in finding the stolen vehicles. After the green pickup truck was located, he was then dropped off at a diner for pickup by Bruner to locate the motorcycle. After that, he was taken by Bruner to the home of his grandmother and entrusted to her care. (Bruner, page 1623)

There is no evidence that Deckard was subjected to custodial interrogation prior to his arrival at the Sheriff's office, with his parents, on the afternoon of August 8, 1991. [*Wissman v. State*], 540 N.E.2d 1209, Ind. [] 1989; [*Cliver v. State*], 666 N.E.2d 59, 66 (Ind. [] 1996)[, *reh'g denied*]; [*Laster v. State*], 918 N.E.2d 428, 432-434[ (Ind. Ct. App. 2009)]. At that time, he was properly advised of his rights and given a meaningful opportunity to consult with his parents before making the statements admitted into evidence at trial.

At trial, the issue of Deckard's minority, the sufficiency of advisements, and a meaningful opportunity to consult with his parents was vigorously litigated at length. (Record, pages 1616-1620; pages 1631-1654; pages 2297-2339)[.] Similarly, the Indiana Supreme Court reviewed the admissibility of Deckard's pretrial statements at length in considering his direct appeal of his conviction and found no error. ([*Deckard v. State*], supra)

The Court notes that there are references to Deckard possibly having been at the Monroe County Sheriff's Department or the Monroe County Prosecuting Attorney's office on August 8, 1991, before being interviewed by Detective Conley. The record of proceedings is completely devoid of any evidence or inference as to the purpose of any such presence, whether that appearance, if it in fact occurred, was voluntary or whether he was summoned, what may have happened during any such visit, or whether he made any statements of any kind related to the investigation. The Court thus concludes that any such

> prior contact was irrelevant and immaterial to the issue before the Court.
>
> It appears to the Court that Deckard argues that his trial attorney's performance was deficient because he did not file a motion to suppress Deckard's pretrial statements, regardless of the extent to which the issue was litigated at trial.
>
> Deckard's contention that the performance of either of, or both, his trial attorney or appellate attorney was deficient for failing to "properly litigate" the admissibility of his pretrial statements is without merit.
>
> Furthermore, it has not been brought to the attention of the Court that were matters pertaining to Deckard's pretrial statements that were not litigated at trial or on appeal. The Supreme Court's ruling on Deckard's direct appeal deals directly with his contentions here, thus constituting res judicata.

Appellant's Appendix at 158-160 (paragraph indents omitted).

[40] With respect to his appellate counsel, we observe that Deckard does not point to the record and our review of the record does not reveal a copy of his 1994 appellant's brief from his initial direct appeal. Deckard also did not present the testimony of his appellate counsel at the post-conviction hearing. Based upon the Indiana Supreme Court's opinion in his direct appeal, it appears that Deckard's appellate counsel raised a number of issues including challenging the trial court's decision to admit, over trial counsel's objection, his statements to police. *Deckard*, 670 N.E.2d at 5. To the extent that Deckard suggests that his appellate counsel was ineffective for failing to develop an argument under Ind. Code § 31-6-7-3 or that his trial counsel was ineffective for not filing a motion to suppress the evidence obtained by the custodial interrogation immediately

following the traffic stop, we observe that the Indiana Supreme Court discussed this statute and custodial interrogation on direct appeal. The Court held that the requirements for the interrogation of juveniles are set out in *Lewis v. State*, 259 Ind. 431, 288 N.E.2d 138 (1972), and codified at Ind. Code § 31-6-7-3. *Id.* at 5. The Court held that the Bloomington police officers complied with those requirements when acquiring Deckard's waiver, and after acquiring the valid waiver, Bloomington police heard Deckard's confession. *Id.* As for Deckard's argument that his trial counsel failed to move to suppress the evidence of the truck, the motorcycle, and the items from the abandoned house based upon Ind. Code § 31-6-7-3 or that his appellate counsel was ineffective for failing to raise the issue, we observe that appellate counsel argued that Deckard's confession was inadmissible because the post-Miranda confession was the result of statements he made to police during their pre-Miranda investigation, and the Court held that the record contained no suggestion that police engaged in any pre-Miranda custodial interrogation. *Id.* at 5-6. The Court also held that "[s]ince the earlier investigation was not custodial interrogation, it is not possible for it to taint the later statements." *Id.* at 6. The Court added that, "even if the earlier statements were the result of an improper custodial interrogation, the results of this later station-house interrogation, where Deckard had been properly apprised of his rights, would remain admissible." *Id.* Further, we observe that Deckard does not develop an argument as to how he was prejudiced by the evidence of the truck or the motorcycle and does not specify which items that were discovered in the abandoned house prejudiced him. Again, we cannot say that reversal is warranted.

B. *Expert*

[41] Deckard phrases the issue as: "The Trial Court denied [his] constitutional right to present evidence when it denied him funds and the opportunity to have a complete psycho-psychiatric evaluation." Appellant's Brief at iv. In his argument section, Deckard argues in part that "[t]he denial of the sentencing expert was a denial of [his] right to the effective assistance of counsel . . . ." *Id.* at 12. However, he also asserts that "[t]rial [c]ounsel zealously pursued an expert for Deckard," that "[t]he Trial Court denied [his] request preferring to use the short-lived IPDC Sentencing Resource Center despite [his] repeated and exhausting attempts to gather evidence," and that his trial counsel "moved for several continuances because of difficulties in getting a doctor from the Resource Center to exam [sic] [him]." *Id.* at 12-13. Thus, he does not appear to argue that his trial counsel was ineffective with respect to the expert. Deckard also does not contend on appeal that his appellate counsel was ineffective with respect to the trial court's denial of funds or even mention his appellate counsel in this portion of his brief. Rather, Deckard appears to focus on the trial court's denial of his request to hire an expert. We conclude that Deckard's claim amounts to a freestanding claim of error, which is not available in post-conviction proceedings. *See Martin v. State*, 760 N.E.2d 597, 599 (Ind. 2002) ("Freestanding claims that the original trial court committed error are available only on direct appeal."); *Lambert v. State*, 743 N.E.2d 719, 726 (Ind. 2001) (holding that post-conviction procedures do not provide a petitioner with a "super-appeal" or opportunity to consider freestanding claims that the original

trial court committed error and that such claims are available only on direct appeal), *reh'g denied*, *cert. denied*, 534 U.S. 1136, 122 S. Ct. 1082 (2002).

## *Conclusion*

[42] For the foregoing reasons, we affirm the post-conviction court's denial of Deckard's petition for post-conviction relief.

Bailey, J., and Robb, J., concur.